Leola Pearl **BECKETT** et al., **Plaintiffs,**
and
Carlotta Mozelle Brewer et al., and United States of America, Plaintiffs-Intervenors,

v.

The **SCHOOL BOARD OF** the **CITY OF NORFOLK** et al., **Defendants.**

**Civ. A. No. 2214.**

United States District Court
E. D. Virginia,
Norfolk Division.

Dec. 30, 1969.

Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), the courts, litigants, school children and parents remain confused with respect to the constitutional requirements touching the desegregation or integration of public schools. That *Brown* and the later cases have established the clear duty to operate a unitary school *system* cannot be doubted. Many problems arise in connection with the interpretation of the mandates emanating from judicial decisions as applied to the local situation. They may vary according to the particular locality; a factor acknowledged by the Supreme Court in the second *Brown* opinion. "Good faith implementation of the governing constitutional principles" would still appear to be the test.

Hill, Tucker & Marsh, Henry L. Marsh, III, Richmond, Va., Louis R. Lucas, Memphis, Tenn., Victor J. Ashe, J. Hugo Madison, Norfolk, Va., Jack Greenberg and James M. Nabrit, III, New York City, Jerris Leonard, Asst. Atty. Gen., Civil Rights Division, J. Harold Flannery and Charles K. Howard, Attys., Civil Rights Div., Justice Dept., Brian P. Gettings, U. S. Atty., Norfolk, Va., for plaintiffs and plaintiff-intervenors.

Leonard H. Davis, City Atty., Willcox, Savage, Lawrence, Dickson & Spindle, Toy D. Savage, Jr., and Allan G. Donn, Norfolk, Va., for defendants.

## MEMORANDUM

WALTER E. HOFFMAN, Chief Judge.

Fourteen years following the implementing decision in Brown v. Board of

As we approach the ultimate and ancillary issues to be resolved in the pending case, reference should be made to the preliminary hearings pertaining to the School Board's *interim* plan,[1] and the District Court's memorandum opinion approving same,[2] Beckett v. School Board of City of Norfolk, 302 F.Supp. 18 (May 19, 1969). In fact, all prior proceedings in this prolonged litigation which commenced on May 10, 1956, have been incorporated into the record. While perhaps it cannot be said that counsel for the plaintiffs and plaintiff-intervenors are willing to concede that the School Board of the City of Norfolk has, at any time since the school-closing days of 1958, exhibited any lack of "good faith," it is significant to note that the courts, both on the trial and appellate level, have praised the School Board of the City of Norfolk as it has approached the prob-

1. Transcripts covering the hearings on the *interim* plan consumed 1,284 pages requiring ten separate days. The more recent hearings on the *optimal* plan of desegregation are contained in eleven volumes—a total of 2,173 pages—but as the hearings were sometimes reported by different court reporters, it was necessary to number each volume of the *optimal* hearings beginning with page 1 in order to expedite the transcription. One volume of the *interim* hearings was also numbered in like manner. Pretrial proceedings required 137 pages being transcribed. Such hearings and pretrial proceedings only relate to proceedings subsequent to the decision in Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4 Cir., 1968).

2. The plaintiffs and plaintiff-intervenors indicated their intention to appeal the order approving the *interim* plan and the District Court prepared its opinion without the benefit of the transcript. No appeal was noted, probably due to the lack of time for appellate review.

lems arising in desegregating the public school system. Even counsel for the NAACP, representing the individual plaintiffs and plaintiff-intervenors, and counsel for the Civil Rights Division of the Department of Justice, representing the United States of America as a plaintiff-intervenor, will freely concede that the School Board, together with its administrative personnel and legal staff, has readily supplied all information desired, and has conferred at length with opposing counsel whenever requested to do so.

■ In the final analysis there is one primary question to resolve. Succinctly stated it is—

Does good faith implementation of governing constitutional principles require *racial balancing* in *each individual school* throughout a school system comprised of many different schools where it is freely conceded that *massive compulsory bussing* will be required to accomplish such racial balancing?

The NAACP and Civil Rights Division argue that the logical answer to the foreing inquiry is in the affirmative.[3] The School Board, with whom this Court agrees as to this point, contends that the answer is in the negative.

The decisions of the Supreme Court and several of the appellate courts, while not expressed with emphasis, suggest two mandates imposed upon school boards, to-wit:

(1) A *negative* mandate which prohibits "effective exclusion" of children by reason of race, creed or color. The key word in this mandate is "exclusion." Such a *negative* mandate applies with

equal force throughout our nation and must be enforced *now*.

(2) An *affirmative* mandate, apparently applicable thus far only where *de jure* segregation[4] has existed prior to the first *Brown* decision, imposed upon school boards to correct, so far as it may be reasonable and feasible, largely segregated schools by providing maximum desegregation under the circumstances confronting the local school board in each area.

There can be no doubts with respect to the *negative* mandate. Many opinions fail to point out with any degree of significance that a particular case falls within the "exclusion" category. The recent cases of Alexander v. Holmes County Board of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19 (October 29, 1969), and Nesbit v. Statesville City Board of Education, 418 F.2d 1040 (4 Cir., Dec. 2, 1969), speak of children and/or faculty members being "effectively excluded" or "no person is to be excluded."

In Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), and Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968), it is abundantly clear that there existed no valid distinction between the negative and affirmative mandates. In *Green*, a case from Virginia, there were only two school buildings in the entire county, both housing grades one through twelve, located in the eastern and western portions of the county, respectively. Buses used overlapping routes to take pupils to and from school. One school was all-Negro; the other was approximately 85% white and, at best, only minimal desegregation existed.

3. The positions of the NAACP and the Civil Rights Division are substantially identical. However, counsel for the Civil Rights Division stated, during the course of trial, that it might be possible to keep "one or two" all-black or all-white schools. (Vol. IX, p. 35) Counsel for the NAACP disagrees and, as to this point, argue that the constitutional requirements are such that *every* school

must be thoroughly desegregated (token desegregation being unacceptable). If the constitutional requirements go as far as either counsel suggests, the Court is inclined to agree with the NAACP as applied to the facts of this case.

4. The issue of *de facto* versus *de jure* segregation will be considered further in this memorandum.

Despite the fact that "freedom of choice" was available to all, only a handful of blacks, and no whites, exercised a choice with respect to entering a school all or predominantly occupied by children of a different race. Thus, "freedom of choice" as a plan adopted by the school board "effectively excluded" children desiring to cross racial lines and the dual school system continued. *Green* and *Raney* are illustrative of school boards contending that they had desegregated completely and *not* that desegregation was proceeding at an adequate pace. Indeed, in *Raney*, the predominantly white school was filled to capacity and the applications of 28 Negroes were denied for this reason. In an interesting review of *Green*, described as an "easy" case, in an article in Harvard Law Review, Vol. 82:63, p. 111, at p. 114, it is said:

> "In more difficult cases, where not all the factors point the same way, the Court will have to refine its analysis of the concepts 'dual system,' 'unitary system,' 'segregated,' 'integrated,' and 'racially unidentifiable.' And it will have to begin facing some of the hard questions involved in implementing *Brown*: in formulating desegregation plans, what weight is to be given to sound policies of education and school administration; what weight to wishes of southern black nationalists for separation, even where by the lights of the larger community the result will be 'inferior' education; what weight to such evidence exists that once the ratio of Negro pupils to whites passes beyond a critical point the educational benefits from integration are reduced or lost altogether? Since *Brown*, the lower courts have been grappling with these issues largely without guidance from the Supreme Court. In *Green* the Court missed an important opportunity to provide guidance by re-articulating the reasons for and the very meaning of 'desegregation.'"

The City of Norfolk, with its hard-core central city area of a black community, now poses some of the foregoing problems, together with many others.

The "hard questions" must now be resolved in this case.

A third case decided along with *Green* and *Raney* was Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). Factually, *Monroe* would appear distinguishable from *Green* and *Raney*, but a careful reading of the opinion demonstrates that the Supreme Court declared the "system" to be discriminatory and made reference to "a" Negro school. In discussing the "free transfer" available in *Monroe*, the Supreme Court pointed out that white children were at liberty to transfer out of an all or predominantly Negro school, even though they resided in the geographical area. This is *not* the transfer provision available in the instant case.

Opinions from other appellate courts point to the conclusion that the operation and maintenance of a particular school building, attended only by black children, is not *per se* constitutionally defective. United States v. Greenwood Municipal Separate School District, 406 F.2d 1086, 1093 (5 Cir., 1969); Goss v. Board of Education, City of Knoxville, Tennessee, 406 F.2d 1183, 1186 (6 Cir., 1969); contra: Adams v. Mathews, 403 F.2d 181 (5 Cir., 1968). The language of Mr. Justice Brennan in *Green* emphatically states that the duty is to eliminate racial discrimination by "root and branch" but, as heretofore indicated, such an expression is definitely allied with the concept of the *negative* mandate and, even if not so limited, has been construed as not requiring the abolition of all-Negro and all-white schools under all circumstances. See: *Goss*, supra.

The School Board freely concedes that the burden rests upon it to demonstrate that the school buildings attended only by black children on the one hand, or by white children on the other, are not the result of *continued* discrimination.

We turn then to the *affirmative* mandate. If such a mandate requires the mixing of racial bodies in each and every school building, irrespective of any local problems confronting the School Board,

the answer is obvious. Under such circumstances racial balancing, or some system approximating same, must be ordered, and it would be a waste of time and effort to file plans which may be educationally beneficial to the children. The Civil Rights Division conceded, in argument, that any approach to racial balancing would annually require a constant shuffling and reshuffling of children throughout the school system. It is agreed by all that such a shuffling process is most detrimental to children. Yet, under the plan strenuously urged upon the Court by the Civil Rights Division and the NAACP, elementary school children will probably not attend one school building more than two or three years at the most.

Assuming arguendo that the *affirmative* mandate is applicable only to instances involving states where *de jure* segregation existed prior to *Brown I* [5] we do not construe the obligation of this mandate as requiring the performance of the impossible or such actions as are wholly unreasonable, impracticable and inconsistent with sound educational principles. The purpose of education is to teach the children—all children regardless of race. If this interpretation is erroneous, why file plans? Why take into consideration local conditions? Regrettably, some courts have interpreted the abolition of "deliberate speed" and the words "desegregate *now*" as an indication that the mixing of bodies is of primary importance and sound educational principles must take a back seat. This Court does not so interpret the language of the Supreme Court in this manner. We still believe that, while implementation toward a unitary system must be immediate and time for compliance with the *negative* mandate has now passed, where a school board presents a reasonable plan grounded upon sound educational principles, there remains room for the adoption of a plan with reasonable prospects for success even though there may remain, for a period of several years, some school buildings which will be occupied only by blacks or by whites.

If the foregoing approach to the problem is incorrect, the Supreme Court must properly bear the responsibility if public education collapses. In the face of superior knowledge available as to the ultimate effect of merely "mixing the racial bodies" without regard to the other aspects of education and social class, it cannot be said that the children, irrespective of race, will benefit. If desegregation in public schools is confined to "mixing racial bodies," we agree with the NAACP in this case and, if an appellate court orders that type of "desegregation" in the public schools of Norfolk, an order will be entered to this effect although it would be impossible of immediate compliance because of the bussing problem. And whether the $4,000,000 capital investment and $800,000 annual operating expense will be forthcoming is indeed problematical, although counsel for the School Board stated in argument that they would make every effort to procure the same, even though it meant sacrificing other aspects of attempted quality education.

The difficulties with respect to the so-called central city, including Norfolk, are so numerous and apparent that it hardly requires any discussion. The isolated pocket areas where blacks reside throughout the city are of no consequence and can be, without insurmountable problems, dovetailed into an adequate desegregation plan. But when we approach the hard-core black area, the same difficult questions arise which

---

5. The Supreme Court has not spoken on the limitations imposed upon school boards in states where *de jure* segregation existed prior to Brown I, as contrasted with states where only *de facto* segregation was present before 1954. We entertain serious doubts whether the absence of *de jure* segregation is sufficient to avoid the *affirmative* mandate. Moreover, we question whether Brown I is a proper cut-off point and whether school segregation laws constitute the only factor in determining whether *de jure* segregation was created. See discussion *infra.*

would confront New York and Los Angeles in their famous ghetto localities if and when these two major cities are required to *thoroughly desegregate* the schools located in Harlem and Watts. All witnesses and counsel freely concede that compulsory massive cross-bussing is the only means available to break up either the hard core black or white areas where there are no nearby areas occupied by the opposite race. If we are to strive for an ultimate goal of random housing pattern by race, Norfolk requires a massive movement of 94.6% blacks to white communities according to Pettigrew; a situation which is rather typical throughout the larger cities of our nation where statistics reflect that a move of 87% blacks to a white community is required in order to create a random housing pattern by race. The magnitude of the problem is apparent with housing; it is only slightly less a problem with schools.

■ As applied to the facts of this case, and under the testimony adduced from experts in the fields of education, psychology and social sciences,[6] we hold that the governing constitutional principles require good faith desegregation of races in public schools, to an approximate minimum of ten percent where the population justifies this percentage, applied to each individual school wherever the particular school can be desegregated consistent with (1) sound educational principles, (2) the cost factor involved including the time and expense of transportation, and (3) the future planning relating to location of school buildings. On the basis of the best available research, we reject the argument that a minority of white children should be *required* to attend a predominantly black school where the white children reside beyond the bounds of a proper and legal zone line. We agree that white and black children alike tend to benefit, through achievement or otherwise,[7] wherever the white pupils are in the majority at a particular school. We decline to accept the invitation to require massive compulsory bussing merely to achieve desegregation, especially where the cost and travel time involved is out of proportion with the probable benefits. Nor do we feel that the Constitution commands racial balancing in each school building predicated upon the percentage of white and black children in the several levels of public education; to-wit, elementary, junior high school, and senior high school. We are also of the belief that, at least with respect to the first three elementary grades, the neighborhood school concept should be retained for an indefinite period.

Having stated, as concisely as possible, the conclusions reached, we turn to the evidence in the case and the collateral issues leading to the ultimate inquiry. In discussing these matters very little reference will be made to the prior history of the Norfolk public school system or its prolonged litigation as the same is fully documented.[8] It is significant to note

6. We have no hesitancy in examining the case from the standpoint of these criteria. It was upon these grounds that the Supreme Court overruled Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896), in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R.2d 1180 (1954).

7. The words "or otherwise" include, but are not limited to, the environment, the cultural values, the necessity of adjusting with persons of a different race, and many other intangibles.

8. Beckett v. School Board of City of Norfolk, Virginia, (reported with Adkins v. School Board of the City of Newport News) D.C., 148 F.Supp. 430 (1957), affirmed sub nom. School Board of City of Norfolk, Virginia v. Beckett (School Board of City of Newport News, Va. v. Atkins), 246 F.2d 325 (4 Cir., 1957), cert. denied sub nom. School Board of City of Newport News, Virginia v. Atkins, 355 U.S. 855, 78 S.Ct. 83, 2 L.Ed. 2d 63 (1957); School Board of City of Norfolk v. Beckett, 260 F.2d 18 (4 Cir., 1958); Beckett v. School Board of City of Norfolk, Virginia, D.C., 181 F.Supp. 870 (1959); Beckett v. School Board of City of Norfolk, D.C., 185 F.Supp. 459 (1959), affirmed sub nom. Hill v. School Board of City of Norfolk, Virginia, 282 F.2d 473 (4 Cir., 1960); Brewer v. School

that the law with respect to desegregation of public schools has changed over a period of years as the judicial decisions have been forthcoming. For example, only eleven years ago, the Supreme Court granted a motion to affirm in Shuttlesworth v. Birmingham Bd. of Education, 358 U.S 101, 79 S.Ct. 221, 3 L. Ed.2d 145 (1958), on the limited ground expressed in the District Court's opinion, Shuttlesworth v. Birmingham Board of Education, 162 F.Supp. 372, 384 (N.D. Ala., 1958—three-judge court), upholding a statute requiring certain tests to be administered to Negro pupils seeking admission to designated schools. It was held that the statute was constitutional *upon its face*. It is certainly doubtful that the same conclusion would be reached at the present time.

## THE PURPOSE AND PRINCIPLES OF THE SCHOOL BOARD'S OPTIMAL PLAN

Since certain modifications were adopted by the School Board for the *optimal* plan following the hearings on the *interim* plan,[9] we deem it appropriate to set forth at length the stated purpose and seventeen cardinal principles of the *optimal* plan. These principles, in the main, are now under attack by the NAACP and Civil Rights Division. The full text is set forth herein and, as footnoted, supply the research data upon which the main controverted principles are based.

### PURPOSE

The Plan is designed to effectuate a constitutionally appropriate unitary school system which will provide equal educational opportunity for all races to the full extent of the capacity of the Norfolk school system.

### PRINCIPLES

The Plan has been evolved to accomplish the stated purposes based upon conclusions arrived at by the School Board and the School Administration, after careful consideration and analysis of the demographic, socio-economic and other circumstances of this school system and adjacent school districts, the results of extensive recent research, and the advice of those well educated and experienced in the field. The more important of these conclusions are set forth below.

1. Desegregation can provide the conditions for an improved educational program for the City as a whole, but, in order to achieve and maintain the benefits of desegregation, the Plan must be soundly designed.

2. Children of all backgrounds tend to do better in schools with a predominant middle class milieu. Such a milieu should be maintained in each school so far as practical.[10]

3. Although there are a significant number of white children in this school system of a low socio-economic class and a significant number of Negro children of a middle class, there is at this time

---

Board of City of Norfolk, Virginia, 349 F.2d 414 (4 Cir., 1965); Beckett v. School Board of City of Norfolk, Virginia, D.C., 269 F.Supp. 118 (1967); Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4 Cir., 1968). See, also, the related cases of James v. Almond, 170 F.Supp. 331 (E.D.Va., 1959—three-judge court); James v. Duckworth, 170 F.Supp. 342 (E.D.Va., 1959) affirmed sub nom. Duckworth v. James, 267 F.2d 224 (4 Cir., 1959), cert. denied 361 U.S. 835, 80 S.Ct. 88, 4 L.Ed.2d 76 (1959); Beckett v. School Board of City of Norfolk, 2 Race Rel.L. Rep. 337 (E.D.Va., 1957—otherwise unreported); Beckett v. School Board of City

of Norfolk, 3 Race Rel.L.Rep. 942–964 (otherwise unreported—School Board Resolution of July 17, 1958); Harrison v. Day, 200 Va. 439, 106 S.E.2d 636 (1959); Adkinson v. School Board of City of Newport News (unreported opinion of May 12, 1959).

9. The principles confronting the court at the hearings on the *interim* plan are stated in the opinion, 302 F.Supp. 18, 28.

10. Harvard Educational Review, Vol. 38, No. 1, p. 67 (Pettigrew); Racial Isolation in Public Schools, Appendices (U. S. Commission on Civil Rights), p. 202 (Wilson Study).

a high statistical correlation in Norfolk between white children and a middle socio-economic level and between Negro children and a lower socio-economic level. In order to maintain a predominant middle class milieu, a school in the Norfolk system must have a clear majority of white children. In most instances, a predominantly Negro school in Norfolk will be of a predominantly disadvantaged socio-economic class.[11]

4. Negroes in predominantly white schools show substantially higher achievement than those in all Negro schools, but Negroes in predominantly Negro schools do no better (if as well) than those in all Negro schools.[12]

5. The achievement of white children in predominantly white schools is no lower than that of white children in all white schools, but the achievement of white children in predominantly white schools is substantially higher than that of white children in predominantly Negro schools.[13]

6. The educational opportunity of Negroes in predominantly white schools is substantially greater than that of Negroes in all Negro or predominantly Negro schools, and the educational opportunity of the white students in predominantly white schools is no less than that of the opportunity of white students in all white schools. A Negro pupil in a predominantly Negro school has no greater educational opportunity than a Negro in an all Negro school, and a white pupil in a predominantly Negro school has less educational opportunity than he would have in an all white or predominantly white school.[14]

7. There is a tendency for the achievement level of children of both races to vary inversely with the percentage Negro in a school, but knowledge of the subject is insufficient at this time to allow a prediction of the critical percentage Negro in a particular school. Such critical percentage Negro varies from school to school, depending primarily upon the socio-economic class of students of both races, but also upon the number, excellence and preparation of faculty; public and pupil attitudes and motivation; the nature of physical facilities; and the character and quality of the program of education offered.

8. It has been clearly established that there will be an improved educational opportunity for Negroes in nearly all combinations of circumstances where the percentage Negro is less than 25%. It also has been clearly established that it is a practical impossibility to provide improved educational opportunity for Negroes or maintain the educational opportunity for whites in a school in which there are more than 50% Negroes, when the Negroes are predominantly of a lower socio-economic class.[15]

9. In order to provide the best educational opportunity for students of both races under the circumstances applicable to the schools of Norfolk, 30% Negro in each school would be *optimal* at this time. The maximum would be 40% Negro in any school, and a percentage that high should be attempted only in instances in which most of the additional factors affecting the result are favorable. A program of continuing research and appraisal for Norfolk schools should be established on the basis of which a determination of *optimal* and maximum percentages should be periodically adjusted.

11. Harvard Educational Review, Vol. 38, No. 1, p. 70 (Pettigrew) ; Racial Isolation in Public Schools (U. S. Commission on Civil Rights), p. 91.

12. Racial Isolation in Public Schools (U. S. Commission on Civil Rights), pp. 113–114; Equality of Educational Opportunity (Office of Education, U. S. Department of Health, Education and Welfare), p. 29 (James S. Coleman, et al).

13. Testimony of Dr. James S. Coleman in Hansen v. Hobson, tr. p. 2090.

14. Racial Isolation in Public Schools, (U. S. Commission on Civil Rights), p. 204.

15. School and Family Effects on Black and White Achievement: A Re-examination of the USOE Data, p. 34, Dr. David J. Armor (now in press).

10. Where the educational opportunity of middle class children of either race is substantially decreased by their being placed in the minority in a school enrolling children predominantly of a lower socio-economic class, those able to do so seek educational opportunity elsewhere, with a resultant instability of school enrollment for individual schools and the system as a whole. The maintenance of a substantial middle class enrollment in the school system is essential to the provision for educational opportunity for Norfolk pupils of both races which is equal to the educational opportunity provided others in Virginia.

11. In the Norfolk system at this time, the assignment of a minority of white children to a predominantly Negro school will not foster equal educational opportunity for either race in either the short or long term.

12. Each school in the system should be *optimally* desegregated to the extent of the number of middle class children available in the system. To this end, there should be no all white schools, except as dictated by practical necessity. Any plan should seek to retain the recognized educational advantages of neighborhood schools at the elementary school level, but all reasonable alternatives should be examined, and any which are practical should be employed to eliminate all white schools.

13. Each child in the system should have at least a substantial number of years of his school career in an *optimally* desegregated school. Compensatory educational methods should be fully employed with any predominantly Negro school which may result from the limits of the number of available white middle class children. In addition, interschool activities and special curricula should provide some desegregated experience for children in every school.

14. An unstable school system, in which frequent substantial changes are required in pupil and faculty assignment, school and grade organization, and construction programs, necessarily causes erosion of the educational program and is unmanageable administratively. The school system should be stabilized to the extent that the plans for organization of grades, facility construction, the placement of faculty, and assignment of students will not have to be again massively rearranged in the foreseeable future. New methods should be examined and attempted, but broad experimentation with the organization of the school system, which is not based on reliable evidence indicating successful results under circumstances prevailing in this City, should not be undertaken because of the potential destructive effect on the system.

15. The success of an educational program depends in great measure upon teachers who are not only prepared educationally to teach the assigned subjects, but who are also competent to perform under the circumstances in which they are placed. The assignment or reassignment of faculty and principals to accomplish desegregation should be implemented with those who have been adequately prepared. Programs should be conducted to provide adequate preparation of all school personnel.

16. The uncertainties, frustrations and delays attendant to the administration of a school system of more than 50,000 pupils under judicial supervision is erosive of that system. The responsibility for the control and operation of the Norfolk public schools should be clearly placed with the School Board, consonant with practical assurance of the constitutional exercise of that responsibility.

17. Public confidence in the quality of the educational opportunity offered by a school system is necessary to the maintenance of that quality. Only when the taxpayers and patrons of a school system have confidence in its present and future programs will it receive the financial and personal support which it requires to maintain quality education. The involvement of those concerned from all segments of the community and a full public understanding of the nature and reasons for any plan evolved are important to public confidence.

The principal attack upon these seventeen stated principles is directed to paragraphs numbered 2 through 14. There is general agreement as to principles numbered 1, 15, 16 and 17.

Reduced to simplicity the objections to principles numbered 2 through 14 lie in the plain fact that, for a number of years at least, certain black children may attend an all or predominantly black school [16] during their earlier years of education. The plan, as designed, does assure that all children, white and black alike, will attend a thoroughly desegregated school for a minimum of three years during their twelve years of public education. Acknowledging that there are cumulative adverse effects on blacks from attendance at a school which is occupied solely or predominantly by children of their own race, the solution of this problem is not readily at hand. Practical difficulties require a balancing of all interests to the end that a sound educational system may be maintained for all children irrespective of race.

What is apparent from the principles and plan is that Norfolk, through its able School Board, is endeavoring to attain a maximum of school desegregation wherever it is consistent with a sound educational system. The olden days of massive resistance are gone forever.

The experts testifying as to the principles in behalf of the NAACP and Civil Rights Division were Dr. Gordon Foster, an Associate Professor of Education at the University of Miami and presently serving as Director of the Florida School of Desegregation Consulting Center,[17] and Dr. William F. Brazziel, an outstanding Negro educator who is presently serving as Professor of Higher Education at the University of Connecticut while on leave from Norfolk State College where he served as Director of General Education and, of course, he has some knowledge of the local situation. To a lesser extent with respect to the principles, Dr. Jack L. Larsen, the Professor of Education and Chairman of the Department of Educational Administration at Rhode Island College, also testified at the hearings on the *interim* plan [18] but, after having an opportunity to study the details of the *optimal* plan, Dr. Larsen did not testify further. Likewise, to a lesser extent as to the principles of the plan, Dr. Michael J. Stolee was presented as a witness for the Civil Rights Division. At the time of the *interim* plan hearings, Dr. Stolee was the Director of the Florida School Desegregation Consulting Center [19] but, by the time of the *optimal* plan sessions, Dr. Stolee had been designated as the Associate Dean of the School of Education at the University of Miami. As Dr. Foster and Dr. Stolee divided their work with respect to this case, Dr. Stolee prepared suggested plans or meth-

16. This is probably true even though all children are granted certain transfer provisions under the *optimal* plan, said provisions stating:

"Any child will be permitted to transfer from the school to which he is assigned under the rules set forth above, to a school which has less than 30% of his race and has available space. Availability of space will be determined by the School Administration under rules of uniform application established by the School Board and designed to encourage *optimal* desegregation. The administrative procedure for such transfer shall be readily available to each child."

17. The Florida School of Desegregation Consulting Center is operated by the University of Miami, but is wholly funded by the federal government.

18. Dr. Larsen was present for the first week of hearings on the *optimal* plan, but was not called as a witness. When he testified at the sessions involving the *interim* plan (which included six of the principles ultimately incorporated under the *optimal* plan), Dr. Larsen had only a brief period to give consideration to the Norfolk school system due to the fact that he had testified two days earlier in a case involving school desegregation in Portsmouth, Virginia, where he proposed a plan which was substantially accepted by the Court. The statement of counsel for the NAACP that Dr. Larsen's testimony on the *optimal* plan would be "largely cumulative" cannot be accepted as would be apparent from a review of his testimony in the Portsmouth case.

19. Dr. Stolee was succeeded in this position by Dr. Gordon Foster.

ods of operation of the Norfolk school system, whereas Dr. Foster devoted his attention to the principles as stated in the plan. Dr. Stolee concedes that he has had no training in the field of social science.

The School Board presented, in addition to the testimony of Mr. Lamberth, the Superintendent of Schools, the highly qualified Dr. John C. McLaulin, employed by the School Board as Director of the Department of Educational Research and Planning, together with Dr. James S. Bash, the Director of the University of Virginia Center on School Desegregation and a Professor in the School of Education, and Howard O. Sullins, a program officer for the United States Office of Education, Department of Health, Education and Welfare at Charlottesville, Virginia. Finally, after initial difficulties,[20] the testimony of Dr. Thomas F. Pettigrew, undoubtedly the most outstanding and knowledgeable person in the field of sociology and race relations as related to education, was taken.

Weighing this mass of testimony it is apparent that the experts are in agreement on certain fundamental issues, but part company on others—largely due to the practicalities of the existing situation. Certain statements made by the School Board's experts may be characterized as favorable to the position advanced by the NAACP and Civil Rights Division. Minor concessions tending to support the School Board were forthcoming from the experts presented by the NAACP and Civil Rights Division. Nevertheless, whatever may be the prior history of these experts, it can be said without qualification that they all favor desegregation of public schools. In fact, one of the articles written by Dr. Pettigrew [21] boasts of the fact that he is a "racial integrationist." The foregoing statements are made simply to demonstrate that there are no "segregationist" views advanced by any witness in this case. Nor are the issues raised herein comparable with any other case previously decided on the appellate level.

What courts are now overlooking is that the primary variable is social class; not race. As Dr. Pettigrew so aptly points out during his cross-examination, if the courts, the Civil Rights Division, and the proponents of desegregation do not awaken to this fact, they are likely to "throw out the baby with the bath water." Indeed, as Dr. Pettigrew examined the prior testimony he "had a little trouble figuring out the sides without a program." He states that Dr. Stolee, Dr. Foster, and Dr. Brazziel have "systematically whittled away and attacked everything which demonstrates the efficacy of desegregation." Thus, in effect, he concludes that unless an intelligent approach is made to the problem of desegregation from a social class standpoint—and not solely through the mixing of racial bodies—desegregation will be a complete failure. "Integration," according to Pettigrew, presupposes desegregation, and the

20. Dr. Pettigrew, after examining Norfolk's principles and plan, agreed to testify at the instance of the School Board. He was subjected to a discovery deposition prior to the *optimal* plan hearings, and thereafter became ill. At one time he declined to go further, assigning the condition of his health as a reason. Subsequently, he agreed to give his testimony at Harvard University and, to comply with the Court's prior order that all expert witnesses appear personally before the Court, the judge and counsel went to Harvard to take this testimony. With colleges and universities receiving substantial grants for research and related matters from the federal government, it is increasingly difficult to secure the services of expert witnesses in issues touching public school desegregation, especially when testifying at the instance of a School Board.

21. Equality of Educational Opportunity in the Large Cities of America: The Relationship between Decentralization and Racial Integration (Teachers College, Columbia University) p. 83. Dr. Pettigrew describes the progress of desegregation in the South as being "slow and painful since 1954," but in the West and North the "situation is worse now than it was at the time of the Court ruling [1954]."

real ultimate benefit is achieved through "integration." [22]

The suggested racial balancing, coupled with mandatory cross-bussing, will accomplish "desegregation" as defined by Dr. Pettigrew, but it will also inevitably mean that the true benefits will never be achieved. We cannot believe that the Supreme Court, in requiring "desegregation," has merely ordered a mixing of racial bodies without consideration of the social class factor.

The crux of the controversy between the experts lies in the theory that children benefit from properly desegregated schools by reason of association with a predominant middle class milieu. We are not now talking about the individual social class of each particular child. It is the social class of the overall group *in gross* which makes desegregated schools advantageous to all. Race, standing alone, is definitely a secondary factor. It is significant to note that all experts are in substantial agreement that the social class is important, although they differ as to the weight which should be attached to this factor.

If the social class of the associated group is, as Dr. Pettigrew states, the most important major criteria in determining the success of desegregation as we now find, it follows that a black child of low socio-economic background and status will probably benefit as much, by achievement or otherwise, if he attends an all-black school of middle class children. The same principle applies to white pupils. Thus, the social class climate is what brings about a heterogeneous school and, to this extent, the *school system is able to exercise some measure of control through the use of a ratio of blacks to whites wherever it can be established from a sound educational standpoint.*

In rebuttal, the experts testifying at the instance of the Civil Rights Division and NAACP argue that the social class of the individual child's family is the greatest single correlate of achievement. This statement is substantiated by the noteworthy Coleman Report. While this may be the acme of perfection, the social class of the individual child's family is hardly susceptible of control by any school system. It is for this reason that the area-based plan predicated upon controlled environment was adopted by the School Board of the City of Norfolk which will, in the final analysis, benefit the greatest number of children, irrespective of race, and thereby bring about a successful plan of desegregation and ultimate "integration" as defined by Dr. Pettigrew.

Obviously the social climate approach is what attracted Dr. Pettigrew to testify in this case. He concedes that the plan is "weak" in some respects, especially at the elementary level [23] but, he says, we must

22. Courts have been reluctant to define such terms as "desegregation" and "integration." Experts place varying constructions upon these words. Dr. Pettigrew defines "desegregation" as a mere mix of bodies, black and white, in the same school, preferably in the percentage ratio of 20 to 40 black. He does not classify the public schools in Washington, D. C., as being "desegregated" where the ratio is 92% black and 8% white. Nor does he label Burlington, Vermont, a "desegregated" school system where the ratio is 2% black and 98% white. "Integration," Pettigrew defines, is the *quality* of the mix and the type of interaction between children of different races, with special emphasis on cross-racial acceptance.

23. Since Dr. Pettigrew testified, information has been received that the Norfolk Redevelopment and Housing Authority and the Council of the City of Norfolk conducted, on December 1, 1969, a public hearing on the proposed East Ghent-South Redevelopment Project, the area of which embraces the Robert E. Lee Elementary School which this current year houses 449 Negro and 7 white children. The area was formerly all white, became desegregated, and is now completely resegregated. The Redevelopment and Housing Authority is also implementing the East Ghent-North Redevelopment Project which embraces the John Marshall Elementary School which this current year houses 525 Negro and 10 white children. Like the Robert E. Lee

be practical in resolving the difficulties presented according to the local situation.[24] As Dr. Pettigrew testified with respect to the Norfolk plan, it is the—

"First time I have seen a public school system flatly attempt to explicate principles that would guide their plans based on the best social science data we now have available."

Again, while admitting weaknesses in the plan (not, however, at the senior high school level), he states, with respect to the work of Dr. McLaulin who had the primary responsibility of drawing the attendance zone lines, the following:

"To maximize desegregation, I think that Dr. McLaulin has pushed that effort to just about the human hilt given the area-based plan."

The foregoing are the words of an admitted "racial integrationist."

All experts agree that there has been *no* gerrymandering to perpetuate segregation. On the contrary, all experts questioned on the subject state unequivocally that there have been several instances of gerrymandering to effectuate desegregation.

In determining the social class climate, it is perhaps true that available research data for Norfolk has not been the best. The pressure of time, now apparently so urgent with the courts, has precluded better data. The experts substantially agree that "income" is not the major factor in ascertaining social class. However, the School Board, confronted with a collapse of negotiations in mid-March 1969, was ordered to prepare and file its *optimal* plan by June 23, 1969. In the interim period, there were eleven (11) days of hearings requiring the attendance of counsel and the administrative school personnel. The census data from 1960 was, of course, available. Information obtained from this source, as analyzed by Taeuber, a sociologist at the University of Wisconsin, reflects that, in 1960, one-half of white Norfolk was middle class, and only 15% to 18% black Norfolk was in the same category. This compared with a nationwide average of 60% of white America being in the middle class, and 25% of black America falling within this grouping. Undeniably, this percentage for Norfolk has increased among both white and black in

area, the John Marshall school was formerly all-white, but gradually became black and the location has resegregated over a period of years. The two elementary schools named above will be demolished. The Housing Authority has assured the School Board that the overall area (bounded by 21st Street on the north, Olney Road on the south, Granby Street on the east, and Colonial Avenue on the West) will be designed to attract both white and Negro citizens. While it is impossible to state when these projects will be completed, it affords an opportunity for an educational park complex to be established if deemed appropriate. The report to the Court on this latest development was filed on December 8, 1969. The area is located in the southwestern portion of the city. This is an example of the recurring problems confronting a School Board with limited funds available for capital improvements.

24. Near the conclusion of the prolonged hearings, the Court noted that a few elementary schools, such as Easton and Fairlawn, were not filled to capacity for the current year. The effective student

capacity of these two schools is 540. The maximum student capacity is 600. During the current year, Easton houses 410 white and 45 Negro pupils. Fairlawn is housing 512 white and 10 Negro children. While it would require bussing by public transportation to move a total of approximately 100 Negro children to these two predominantly white schools, the overall expense, even if assumed by the School Board, is not an insurmountable problem. Counsel for the School Board agreed to pursue this matter, as well as certain other predominantly white schools where there may be a reasonable number of vacancies, in an effort to attain more desegregation involving black children in predominantly white schools. While the Court is approving the plan as submitted by the School Board, immediate steps should be taken, effective with the second semester, to fill the vacancies in predominantly white schools by Negro children and, if possible, from the hard-core central city area. Application of the transfer provision may be the appropriate manner if the parents are agreeable.

the past ten years. The 1970 census will demonstrate the extent of the change. In the main, the School Board relied upon (1) a Neighborhood Analysis, prepared by the City Planning Commission in August 1967, (2) Consumer Profiles for the Norfolk-Portsmouth Metro Area in January 1969, and (3) City Profiles for the Norfolk-Portsmouth Metro Area in April 1969. The social conditions set forth in (1) above specify income, education, unemployment, infant mortality, tuberculosis cases, juvenile offenses, adult offenses, food stamp applications, food stamp recipients, welfare applications, and welfare recipients. This criteria is allocated according to planning districts and it requires no genius to convert a specific school area into the proper planning district. True, some will overlap and it does not give precise figures, but it cannot be said, as urged by the plaintiffs and plaintiff-intervenors, that the *sole* basis for such determination is on "income." Moreover, it is believed that the 1970 census will be comparable with the figures supplied by the Planning Commission, except to the extent that there has been an interim change in housing patterns.[25]

With personal knowledge of the particular areas throughout the City of Norfolk, it is a reasonably safe assumption that, analyzed by any method acceptable to the field of social science, the low and middle social class climate area-based plan is reasonably accurate as presented by the School Board.

Closely allied with the issue of social class climate and ultimate success of the Board's plan is the subject of middle class flight. While there are those who refer to this as "white flight," the experts do not emphasize that term, although there may be more whites than blacks who tend to flee from central cities. Statistically, it is probably next to impossible to determine just how many whites or blacks move out of a central city for the purpose of protecting a middle class education for their children.[26] The middle class Negro is more likely to move to an area outside the hard core black population than is the Negro in the lower socio-economic group. Especially is this true due to the rapidly shifting population in Norfolk where re-segregation has become an increasing problem.

Anti-metropolitanism, as it is sometimes called, brings into focus what will happen to Norfolk if racial balancing, coupled with compulsory cross-bussing, is adopted as advocated by the NAACP and Civil Rights Division. The local School Board is endeavoring to deter the middle class flight by promoting a reasonable ratio of whites and blacks throughout the school system and, at the same time, assuring a thoroughly desegregated school system for a minimum of three years throughout the educational process for all pupils, together with every reasonable prospect for long-range successful integration according to Pettigrew.[27] If the middle class elects to move across the city line into the adjacent cities of Virginia Beach and Chesapeake, there will be nothing left in Norfolk which will provide a solid basis

25. The Court makes no specific suggestion as to further research on the social class climate of each area. The experts indicate that the extent of parental education is the most important criteria to follow. Whether forms could be distributed to school children for completion by the parents, thus revealing their edution, is a matter for the Board to determine. Conceivably the parents may object to completing such a form, but it may be worth the effort.

26. While not a part of the record, it is a matter of general knowledge that two of the original counsel for the plaintiffs in this case formerly lived in the central city area. While they still maintain their law offices in Norfolk, they have since moved across the line to Virginia Beach where they reside along with high and middle class residents of that area. They live, in fact, within several hundred yards of the Norfolk city line.

27. Perhaps the prospects for success of the plan are best demonstrated by Dr. Pettigrew's agreement to serve the School Board as research consultant now and in the future years.

for a sound educational system as the lower class, whether white or black, cannot benefit merely by reason of mixing the bodies.

We are mindful of the fact that the School Board's plan may result in a mere experimentation but, if so, it is presently well supported by the best available research and brains on the subject. Many of the difficulties confronting courts and litigants have been due to a lack of more specific definition of words. Legal definitions of "desegregation," "integration," "system," "unitary," "nondiscriminatory," "racially unidentifiable," and many other words are woefully lacking. Does the "system" infer that each individual school building must be thoroughly "desegregated" *now*? If so, as applied to Norfolk, racial balancing and compulsory cross-bussing constitute the only answer.[28] We do not believe that the Supreme Court has ruled out reasonable experimental plans grounded upon factors which give rise to the belief that such experimentation will lead to successful integration for the city as a whole. On June 2, 1969, the Supreme Court, speaking through Mr. Justice Black in United States v. Montgomery County Bd. of Educ., 395 U.S. 225, 235, 89 S.Ct. 1670, 1675, 23 L.Ed.2d 263 (1969), stated, in part, "(T)his Court also has recognized, in this field the way must always be left open for experimentation."[29] It is interesting to note that, in *Montgomery Board of Education*, there is dicta with respect to the subject of racial balancing among the faculty. Apparently the United States conceded in its brief that racially balanced faculties are not "constitutionally or legally required." However, the Supreme Court did not intimate its position on the subject. It is, of course, a great temptation to any district judge to order racial balancing in each individual school building, as such a requirement would probably remove school desegregation cases from the docket when the computer takes over. Nevertheless, there are at least some district judges who feel that the primary function of the public school system is to furnish the children with the best available education, without regard to race, consistent with the long-range problems presented by the local situation.

The proponents of massive compulsory bussing for the purpose of achieving racial balance point to what was accomplished in Berkeley, California. The major difference between Berkeley and Norfolk is that the former occupies nine (9) square miles, whereas Norfolk consists of sixty-one (61) square miles. Berkeley also has a very high level of Negro education among its residents, but the converse is true in Norfolk. As Dr. Pettigrew expressed the situation:

"I think it [Berkeley] offers you a very inspiring good data to support the evidence of effectiveness of integration. I don't think it tells Norfolk about how to work out a plan, unfortunately."

We should perhaps add that Dr. Pettigrew is not *per se* opposed to compulsory bussing if held within reasonably manageable bounds, and conditioned that the mandatory bussing does not "squeeze too hard on the middle class flight and

28. The plan or proposal advanced by the Civil Rights Division through Dr. Stolee was stated not to be the perfect answer. However, the School Board's experts concede that Dr. Stolee's plan, if required by law, is as good as any that could be submitted.

29. See, also Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968), where it is said: "There is no universal answer to complex problems of desegregation; there is obviously no one plan that will do the job in every case. The matter must be assessed in light of the circumstances present and the options available in each instance. It is incumbent upon the school board to establish that its proposed plan promises meaningful and immediate progress toward disestablishing state-imposed segregation. It is incumbent upon the district court to weigh that claim in light of the facts at hand and in light of any alternatives which may be shown as feasible and more promising in their effectiveness."

metropolitan problem." That the massive cross-bussing will definitely put the "squeeze" upon middle class flight, both intercity and intracity, is apparent from the record due to the high percentage of rental units in Norfolk with its large military population. According to the 1960 census data, out of a total of 85,-241 dwelling units there were 43,118 renter-occupied dwelling units. From an intercity standpoint Norfolk is handicapped in that Virginia Beach and Chesapeake have a relatively small percentage of lower social class persons in the immediate area surrounding Norfolk. Portsmouth, separated from Norfolk by the Elizabeth River, has a high percentage of blacks, including many of the lower social class climate from both races, thereby precluding any appreciable middle class flight to that city. The Educational Park complex has its attractive features from an intercity viewpoint as it would not involve cross-bussing, even though it would mean massive bussing. Irrespective of the benefits to be derived from a Metro-Educational Park, it is obvious that such cannot be created when Virginia Beach, Chesapeake, and the Commonwealth of Virginia are not parties to this action and, even if these separate political subdivisions and the state were made parties, serious constitutional questions arise.

While the intracity Educational Park complex would perhaps not present too extensive cross-bussing, it remains debatable whether it would substantially relieve the problems in Norfolk. The opportunity for consideration of an intracity Educational Park complex is available with the contemplated demolition of two elementary schools, Robert E. Lee and John Marshall, as heretofore mentioned in footnote (23). However, a goodly portion of the central city is hard upon the City of Chesapeake where there remains no prospect of an effective complex without the cooperation of Chesapeake. Moreover, any discussion of an Educational Park complex is in its infancy and has not been the subject of required research.

It is argued that the elementary schools should be paired and/or closed in substantial accordance with what is known as Princeton pairing. In rural areas this has brought about a marked degree of desegregation and, where the ratio of white to black does not exceed 60–40, it is deemed successful. In the urban areas where the lower social class exceeds 10%, Dr. Pettigrew refers to pairing and closing as "Band-Aid" methods in that the border between white and black is constantly moving in central cities and any pairing is successful only around the borders of the ghetto. He likens the Norfolk central city area to Chicago, Los Angeles, and New York where, according to Pettigrew, pairing is impossible from the standpoint of successful desegregation. Stated otherwise, the "Band-Aid" would have to be moved to another finger. How long such a system could be effective, bearing in mind the terrific expense involved, is not only problematical but it approaches the ridiculous. Stated otherwise, it is impossible to have all black and white children in optimum desegregated situations on the elementary school level.

Much of the argument centers upon the issue as to whether minority white children should be required to attend majority black schools, especially where the white children live beyond the boundary line of a school zone where an all-black school is located. The Civil Rights Division and NAACP contend that token desegregation of whites into black schools is better than none at all but, in general, they insist that the previously all-black school must now constitutionally be made up of at least 25% whites—at all times agreeing, however, that it would be preferable to have a majority white. For the purpose of avoiding repetition, nothing will be discussed at this point with respect to the bussing problem—a matter that is all too obvious.

Admittedly data on the achievement of minority white in majority black schools is not exhaustive. It is difficult to study because whites in predominantly Negro schools tend to be the very low social

class and status throughout the United States. Since the power of peer culture is that a child learns from other children more than he learns from the teachers or principal, it follows that achievement or regression is not readily ascertainable. The relationship between percentage Negro and the achievement of students is not linear; if it were linear, there would possibly be some improvement by adding white children. There is no sound basis for concluding that, despite the views of Dr. Foster and Dr. Stolee, majority black schools do better than all-black schools. In interpreting the use of variables under the Coleman Report and the more recent Armor Study, Dr. Foster seemed to be of the wholly erroneous impression that a correlation coefficient should be stated in percentages. The test scores from Campostella and Chesterfield Heights elementary schools furnish no basis at all for concluding that mixed racial schools with minority white do as well or better than an all-black school. In fact, Dr. Pettigrew vehemently criticizes the views of experts who rely upon such incomplete data.

The Coleman Report [30] states in part "often those Negroes in classes with only a few whites score lower than those in totally segregated classes." This brief statement is rather inclusive, although Dr. Coleman thereafter testified in Hobson v. Hansen, 269 F.Supp. 401 (D.D.C., 1967), that, "As the racial composition of the school is a higher proportion of white, the Negro students in the school will achieve more than if the racial composition of the school is predominantly Negro; * * * the same result is true for whites as well, but the relationship is only about half as strong. In other words, the achievement of white students in predominantly white schools is then higher than the achievement of white students in predominantly Negro schools, but the difference in their achievement is only about half as great as the case for Negro students." Stated otherwise, if the white children of the middle class are required to attend a predominant Negro school, those children will not achieve nearly as much as they would if permitted to attend a predominantly white school.[31]

The very purpose of the study by Dr. Armor was to update the Coleman data and to verify or refute its accuracy. On the point in question,[32] the Armor Study tends to show a definite breaking point where the black ratio exceeds 30 to 35%, thereby supporting the percentage ratio established by the School Board in this case. It is also interesting to note that, while the white students generally score higher than the black in predominantly white schools, the effect is reversed in schools where there is a definite majority black, in which event the blacks score higher than the whites. Moreover, there is a tendency for blacks to score even higher as the percentage approaches 100. If we follow this reasoning through to its logical conclusion, blacks are better off by attending an all-black school as contrasted with blacks attending a predominantly black school. On the other hand, white children do not achieve as well as the blacks in attending predominantly black schools. It may well be argued that these figures are due to the fact that the white child attending a predominantly black school is of the lower social climate but, if so, we trust that there is just as much interest in the disadvantaged white child as with respect to the disadvantaged Negro child.

In sum, Pettigrew assigns five reasons why the ratio of 70% white to 30% Negro, with a maximum of 60% white

---

30. Equality of Educational Opportunity, U. S. Department of Health, Education and Welfare, Office of Education (Report to the President and Congress, July 2, 1966), p. 29.

31. In the document entitled Racial Isolation in the Public Schools, it is said at

p. 204, "Predominantly Negro schools generally are regarded by the community as inferior institutions."

32. School and Family Effects on Black and White Achievement: A Re-examination of the USOE Data, 1969, p. 34 and Figure 2.

and 40% Negro, points to long-range success. His testimony is quoted:

"(1) That I believe it will minimize the middle class flight, if you want to call it that. I don't think it excludes it completely, that's why I use 'minimize.'

"(2) That I think it gives you a good chance for integration, not just desegregation, therefore maximizes black achievement.

"(3) Maximizes or should maximize white achievement.

"(4) It should maximize other positive benefits, non-achievement benefits, like college aspirations, occupational aspirations, interracial—better interracial attitudes and behavior on the part of blacks.

"(5) The same non-achievement benefits on the part of whites."

With these conclusions of a "racial integrationist," we turn to the operative effect of the School Board plan and the suggestions or plans submitted by the experts employed by the Civil Rights Division.

## THE OPERATIVE EFFECT OF THE SCHOOL BOARD PLAN

Throughout the able examination of witnesses by counsel for the Civil Rights Division and NAACP, there is constant reference to the percentage of schools which, for the present at least, will remain all or substantially of one race or another. It is suggested by these counsel, and by experts testifying in their behalf, that, under the *optimal* plan, only 18% of the school children will be attending "desegregated" schools, whereas 82% will remain in "segregated" schools. These figures are presented *without adjustment*, and they *exclude* all Negro children attending schools with more than 25% black in attendance. Adjusting these figures based upon the 1968–69 school year, and assuming that the new senior high school will be open by September 1972, we find quite a different picture as evidenced by School Board Exhibit No. 21 and supported by Dr.

Pettigrew's predictions. Assuming arguendo that, under the *optimal* plan, the ratio of white to black is reasonably maintained at not more than a 60–40 basis, it is perhaps appropriate only to consider the percentage Negro who will be attending a desegregated school. If we further assume that a "racially unidentifiable" school is one housing not less than 10% of one race, the figures (predicated upon current enrollment) reveal that the percentage of Negroes attending such schools will be as follows:

Elementary schools — 23%
Junior high schools — 43%
Senior high schools — 100%

A schedule attached (Appendix A) states the schools in which children of opposite races are in attendance at varying percentages—10%, 20%, 25%. Appendix A likewise reveals other interesting figures which tend to show that there now exists considerably more desegregated situations than those represented by counsel for the plaintiffs and plaintiff-intervenors.

Immediately, of course, an attack is made on the acceptance of a 90–10 ratio in classifying a school as "racially unidentifiable" or "desegregated." Until the Supreme Court speaks on the subject, no one can tell what is correct. The experts all agree that there is some viewpoint supporting the 10% rule. One or two prefer 25%. Dr. Pettigrew testified that there was no consensus of opinion on the 20% as fixed by him; nor on any bottom figure; he has merely selected 20% to be "on the side of safety." He further states that opinions on the bottom figure are far more varied than the maximum 40%, or possibly 45% under extreme circumstances, of black as an indication of successful integration. Bearing in mind that we are in a field of experimentation, we have tentatively accepted the 10% rule as an initial figure of what constitutes a "racially unidentifiable" school or a "desegregated" school.

Even for the 1970–71 school year, without a new senior high school and using

the 90–10 rule, it would appear that the elementary schools (unadjusted) would be 23%, the junior high schools (adjusted) would be 33%, and the senior high schools would result in 62% attendance at desegregated schools. Confusing as these figures may be, it is indeed difficult to say that Norfolk is operating a *dual school system,* unless a *unitary* system means that each and every school building and classroom must be racially balanced.

Pettigrew expressed the opinion that, over a reasonable period of time under the *optimal* plan, at least 40%, and perhaps as high as 55%, of the black elementary children will be in attendance in desegregated schools; i. e., schools with at least 20% black in attendance.

We shall now endeavor to outline some of the problems on each level of education.

## SENIOR HIGH SCHOOLS

Following the remand in Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4 Cir., 1968), and the order denying rehearing on October 7, 1968, counsel were convened as described in the opinion on the *interim* plan, 302 F.Supp. 18, 20–21. It was readily apparent that the new senior high school could not be constructed in the area adjacent to the existing Booker T. Washington High School without moving a high percentage of white children into the hard-core central city. The Board finally selected a 50-acre site on Tidewater Drive near the Forest Lawn Cemetery. The surrounding housing area is largely white at present.

The experts and counsel are now substantially in agreement as to the foregoing location. At the time of final argument on December 8, 1969, counsel, at the urging of the court, intimated that an agreed order would be forthcoming, thereby permitting this construction to proceed to the end that it will be ready for occupancy by September 1972.

The new senior high school, located at the selected site, will provide 100% desegregation on this level of education, accepting "desegregation" under any definition known to mankind. There are, and will be, five senior high schools in Norfolk. While there is continuing danger of Maury High School becoming increasingly resegregated, the Housing and Redevelopment projects referred to in footnote (23) may tend to alleviate the problem.[33]

During the course of the extended hearings on the *optimal* plan, an attorney for the United Black Federation of Norfolk appeared and sought to present petitions carrying the names of approximately 10,400 citizens expressing a desire to have the new senior high school on the site adjacent to the present Booker T. Washington High School, but requesting that the new school be integrated. Since this group did not seek to intervene, the Court could not consider the petitions. However, at the suggestion of counsel, the petitions were delivered to the Chairman of the School Board and this fact is in the record.

There are, as of the current year, 2,275 children in attendance at Booker T. Washington High School. All but seven (7) are black. The argument is advanced that if the new senior high school is constructed as a modern edifice, complete in every respect, white children will seek admission to this new school. Dr. Pettigrew, when questioned about a "magnet" school, testified that there was no such instance in the United States where this had worked, and that it would be "amazing" to predict success in Norfolk. Aside from the fact that there would probably be few, if any, white childern exercising any such option, irrespective of the quality of the school, there is obviously too much difficulty in

33. During the current school year, Maury High School is attended by 926 whites and 1047 blacks; this despite the fact that the zone lines were adjusted to place approximately 200 black children from the Maury area into Granby High School where desegration is at a lower rate.

"tracking" and keeping whites in a high school centered largely in the ghetto area.

To desegregate, on a 60–40 basis, a new high school located in that area—and for the same reason the existing Booker T. Washington High School—on an educationally sound basis would require moving 1,358 white children an appreciable distance. This means that 1,358 black children must be cross-bussed to other high schools.[34] This alone should be a sufficient answer to the arguments for *now* desegregating Booker T. Washington and against relocating the new structure in the same area. What will the 1,358 black children and their parents say about the 917 black children remaining in the new school? Above all, there will be, according to Pettigrew, black resentment over the fact that 1,365 white children have "taken over" a school constructed in a black area, primarily for the benefit of the black children.

If an order is not presented in the interim, the order approving the plan will provide that the new senior high school may be constructed at the site selected by the School Board. The Court urges counsel, even though an appeal will undoubtedly be taken, to provide in the order that no appeal is noted as to this proposed construction which has been delayed entirely too long because of the requirement that a federal court must approve site locations for new schools.

## THE FUTURE OF WASHINGTON HIGH SCHOOL

Once replaced, Booker T. Washington remains as a building capable of many uses. By reason of a fire in April 1969, it has now been completely renovated. It is contemplated that this structure may be used as a "special educational facility," including use as a community and adult education Center following future renovations. Programs will include vocational job entry training and adult basic education opportunities with appropriate health, welfare, and recreational services being maintained. Space will be provided for ancillary services of Model City, Central City and other community action agencies.

No fault can be found with the foregoing. However, it is provided that the uses stated above "will be subject to requirements for high school level programs which may take precedence in the event they are needed." One can readily understand that, in future years, an overflow condition may develop on any level of education and, on a temporary basis at least, there may be justification for use of Booker T. Washington.

During the course of the hearings, however, there was some suggestion to the effect that the facility could be maintained for use by those advocating black separatism. Without a controlling decision from the Supreme Court or United States Court of Appeals for the Fourth Circuit, no approval could be given for use of any public building for such purposes. If the Constitution requires desegregation of races in public schools, there is no room to legalize black separatism in this area. This is not a condemnation of black separatism; it is merely a statement that it is, at present, constitutionally impermissible on the public school level. As with respect to Negroes who fought for desegregation of schools, the black separatists will have to pursue the legal channels before any court approval can be obtained.

Subject to the comments heretofore made, the contemplated future uses of the present Booker T. Washington High School are approved.

## JUNIOR HIGH SCHOOLS

These schools, with minor exceptions, house grades 7, 8 and 9. The senior high schools accommodate grades 10, 11 and 12.

There are presently eleven (11) junior high schools in Norfolk. Campostella, Jacox, Madison, Rosemont and Ruffner are either all or substantially black from

34. We acknowledge, of course, that nearly 2,268 black senior high school children would require transportation under the *optimal* plan.

the standpoint of the student body. Blair, formerly all-white, is now in the process of resegregation with the current enrollment indicating 759 blacks and 651 whites. The remaining five (5) junior high schools clearly show signs of reasonable desegregation and, as to these schools, there are no substantial complaints. Campostella, Jacox, and Ruffner are located in the hard-core central city. Madison and Rosemont are in pocket areas where there is a high degree of concentration involving a reasonably large number of black families. Madison, at one time, was an all-white school and, as the area rapidly turned all black an appreciable number of years ago, this school became all-black and was made to house elementary and junior high school children. Rosemont is essentially an elementary-junior high complex. According to present enrollment, Rosemont houses 409 blacks and 41 whites in the entire complex.

The *optimal* plan contemplates attendance at junior high schools through a feeder system as follows:

| Junior High Schools | Feeder Elementary Schools |
|---|---|
| Azalea Gardens | Bay View,[35] Tarrallton,[35] Little Creek Elementary[35] |
| Blair | Larchmont,[36] Stuart,[36] Monroe ($\frac{1}{2}$),[37] Taylor,[35] Sewells Point,[36] Camp Allen,[38] Meadowbrook,[35] Marshall,[37, 39] Madison[37] |
| Campostella | Gatewood,[37] St. Helena,[37] Lincoln,[37] Tucker,[37] Diggs Park,[37] Campostella Elementary[36] |
| Jacox | Lindenwood,[37] West,[37] Roberts Park,[37] Bowling Park[37] |
| Lake Taylor | Pineridge,[35] Fairlawn,[35] Easton,[36] Poplar Halls,[35] Ingleside,[35] Chesterfield,[37] Liberty Park[37] |
| Northside | Willoughby,[35] Ocean View,[35] Calcott,[35] Granby Elementary,[35] Suburban Park[35] |
| Norview | Norview Elementary,[36] Coleman Place,[35] Sherwood Forest,[35] Lansdale[35] |
| Rosemont | Oceanair,[35] Crossroads,[35] Larrymore[36] |
| Ruffner | Goode,[37] Carey,[37] Young Park,[37] Titus,[37] Tidewater Park,[37] Lee[39] |
| Willard | Lakewood,[35] Monroe ($\frac{1}{2}$),[37] Lafayette[35]–Ballentine (new)[35] |

The plan states that adjustments in the designation of feeder schools for future years may become necessary by reason of (1) changing residential pat-

35. All or predominantly white schools— less than 10% desegregation.

36. Desegregated at least to the extent of 10% black, and in several schools the percentage is considerably higher.

37. All or predominantly black schools— less than 10% white children in attendance, but several schools have a handful of white children.

38. Camp Allen, now in the process of construction, will accommodate the Naval Operating Base area where a large group of white and black families live. Hence, Camp Allen will be thoroughly desegregated.

39. Robert E. Lee and John Marshall elementary schools are subject to footnote (23) relating to the new Redevelopment and Housing Projects.

terns, (2) construction of new facilities, and (3) additions to or abandonment of old facilities but, whatever may be the reason for any change, desegregation will continue to be one of the primary considerations.

It is further stated that the capacity of Rosemont and Willard will have to be increased by 350 and 300 seats, respectively, to accommodate the designated feeder schools. A new junior high school will be required in the near future and the Board assures that its location will assist in providing desegregation for children residing in areas now assigned to predominantly Negro junior high schools.

It is anticipated that, upon the completion of the additions and predicated upon the 1968–69 enrollment data, the junior high schools will then be 66% desegregated on the basis of a "desegregated" school being at least 10% of one race or the other. However, according to the maximum 60–40 ratio as provided in the plan, the percentage of blacks attending desegregated schools in this level of education will be 43% and the percentage of whites will be 82%. Dr. Petti-

grew expressed the view that these predictions could be accomplished without difficulty and leaned to the belief that even a greater percentage of blacks would be attending desegregated schools on at least a 90–10 basis.

## JUNIOR HIGH SCHOOLS

### Civil Rights Division and NAACP Plan

Reference will now be made to the junior high school suggestions as advanced by Dr. Stolee.

This witness presented a comprehensive feeder zone arrangement for all levels of education which admittedly is racially balanced and will require massive compulsory cross-bussing. As it is agreed that the senior high school level will be, under the *optimal* plan, thoroughly desegregated under any definition of that word, it is unnecessary to consider the junior high schools which will feed into the upper level of secondary education.

The Stolee plan contemplates attendance at junior high schools through the following feeder system:

| Junior High Schools | *Feeder Elementary Schools* |
|---|---|
| Azalea Gardens | Little Creek Elementary (grades 5–6), Little Creek Primary [40] (grades 3–4), Lincoln (grades 1–2), Gatewood (grades 5–6), Larrymore (grades 1–4). |
| Blair | Stuart, Marshall (grades 5–7), Meadowbrook (grades 1–4), Sewells Point (grades 1–4), Madison (grades 5–6), Larchmont (grades 1–4), Taylor (grades 1–4). |
| Campostella | Campostella, Liberty Park (grades 5–6), Ingleside (grades 1–4), Poplar Halls (grades 1–4), Diggs Park (grades 3–6), East Ocean View (grades 1–2), Pretty Lake (grades 1–2), Chesterfield. |

40. There is no such school as Little Creek Primary school. Dr. Stolee devised this procedure as the children who would ordinarily attend grades 1–2 at Little Creek Elementary would be transported to Lincoln, a presently all-Negro elementary school located in the hard-core central city area. In turn, Lincoln black children, after attending Lin-

coln for grades 1–2, will be shuffled off to Little Creek for grades 3–4–5–6. The same pattern is followed with many other elementary schools throughout the system. It is a clear illustration of racial balancing. Appendix B, attached hereto, attempts to give some idea of the massive cross-bussing required under Dr. Stolee's plan.

| Junior High Schools | *Feeder Elementary Schools* |
|---|---|
| Jacox | Camp Allen, Roberts Park (grades 5–6), Willoughby (grades 1–4), Ocean View (grades 1–4). |
| Lake Taylor | Tucker (grades 5–6), Fairlawn (grades 1–4), Easton (grades 1–4), Bowling Park (grades 4–6), Lansdale (grades 4–6), Pineridge (grades 1–3). |
| Northside | Oceanair (grades 4–6), Young Park (grades 1–3), Oakwood,[41] Calcott (grades 1–5), Crossroads (grades 1–5), Titus (closed). |
| Norview | Norview Elementary, Monroe (grades 5–6), Sherwood Forest (grades 1–4), Coleman Place (grades 1–4). |
| Rosemont | Suburban Park (grades 4–6), Carey (grades 1–3), Lee (grades 5–6), Granby (grades 1–4). |
| Ruffner | West (grades 5–6), Tarrallton (grades 1–4), Bay View (grades 4–6), Goode (grades 1–3), Tidewater Park (grades 1–3). |
| Willard | St. Helena (grades 5–6), Lakewood (grades 1–4), Ballentine, Lafayette (grades 4–5), Lindenwood (grades 1–3). |

---

We reject the Stolee plan for the reasons heretofore assigned including, but not limited to, the massive compulsory cross-bussing program, and for the additional reason that such a plan would require annual revision to maintain a racial balance in accordance with the wishes of the Civil Rights Division and the NAACP because of inevitable resegregation.[42]

We have not attempted to compute the mileage or time of travel for children going from the residential areas in the neighborhood of each elementary school to the respective junior high schools assigned under the Stolee plan. As noted, Appendix B gives a rough approximation of the distance to be traversed in shuffling between elementary schools under the pairing system adopted by Dr. Stolee. The distance and time of travel from elementary schools to junior high schools would be *in addition* to what is set forth in Appendix B.

We cannot agree that any overall beneficial effects of desegregated schools

41. The School Board contemplates converting Oakwood into a facility to minister to the needs of children with special learning problems of both physical and mental origin, and the program will be conducted on a desegregated basis. Dr. Stolee did not bother to confer with the school administrators as to the probable future use of each school.

42. The so-called border areas are constantly confronted with resegregation. For example, Stuart Elementary is located in Colonial Place which, at one time, was an all-white residential area. Statistics on school attendance at Stuart demonstrate the change in housing pattern over the past few years as follows:

| School Year | White | Negro |
|---|---|---|
| 1965–66 | 883 | 17 |
| 1966–67 | 821 | 63 |
| 1967–68 | 703 | 206 |
| 1968–69 | 337 | 437 |
| 1969–70 | 281 | 559 |

It is obvious that Stuart will soon be resegregated, as with respect to Blair, Maury, and other schools, if the pattern continues. It should also be noted that Colonial Place residents, both white and black, have engaged in unified efforts to keep the area on a high plane residential location for both races.

will justify this proposed mumbo jumbo. It is a flagrant example of the use of massive cross-bussing to obtain racial balancing in each and every school throughout the system, except Campostella, Chesterfield Heights and Stuart elementary schools as to which three schools the author of the plan offers no present solution.[43]

## ELEMENTARY SCHOOLS—
## SCHOOL BOARD PLAN

### References to Civil Rights Plan

The Board's plan for elementary schools embraces the neighborhood concept, subject to the transfer provisions specified in footnote (16). Once again, the Board recognizes the necessity for changes due to residential patterns, construction of new facilities, and additions to or abandonment of old facilities, with the complete assurance that desegregation will continue to be one of the primary considerations in any boundary adjustment.

A new school is contemplated in the Ballentine-Lafayette areas for the 1971–72 school year. The site has not yet been selected. During the course of trial the Court suggested the possibility of bringing the Villa Heights area, now all-black but formerly all-white, into this complex, hereby giving promise to a thoroughly desegregated school. However, the site location is, initially at least, for the determination of the Board.

Oakwood Elementary School will be converted as previously noted in footnote (41). The newer portion of Titustown Elementary School will be used for the same purposes as Oakwood, since the children at Titustown will probably attend Camp Allen.

Norfolk has been using funds obtained from the federal government under Title I of the Elementary and Secondary Education Act. This is more commonly known as "compensatory education." The programs are designed for the benefit of disadvantaged children. While they are operatively desegregated, these programs involve primarily Negro children because of the high correlation between black children and the disadvantaged child.

While compensatory education does seem to assist with optimal desegregation and integration, it is no substitute for desegregation and, in general terms, has been a failure. It seems to have run the gauntlet after one or two years. It is better than nothing, but its effectiveness has most assuredly been questioned by the experts. In St. Louis the full force of compensatory education was tested. For the first two years it seemed to do well, but, thereafter, the record of achievement was little better than zero. Irrespective of the apparent failure of the compensatory education program (used in Norfolk in all-black or predominantly black elementary schools), the Board will continue the program so long as funds are received under the Elementary and Secondary Education Act. While the outside experts are skeptical of the success of compensatory education, they agree that it is better than nothing, and the administrative personnel of the school system seem to believe that some benefit has been derived from same.

Dr. Foster, the expert engaged by the plaintiffs and plaintiff-intervenors, recommended the closing of certain elementary schools. He insisted that, in making this determination, desegregation was *not* a major consideration. In sum, Dr. Foster recommends the closing of 17 of the 53 elementary schools over a period of the next few years. He con-

---

43. From Appendix B it will be noted that Campostella, Chesterfield Heights and Stuart are heavily black, and will remain this way with no effort being made to create a predominant white student body which all experts agree is preferable from a sound educational standpoint. Norview elementary is presently desegregated on an educationally sound basis with 299 whites and 170 blacks and is, therefore, not paired with any other school. Camp Allen, in process of construction, will undoubtedly have a thoroughly desegregated facility, and has not been paired with any other school.

cedes that he only made a "windshield" inspection of these buildings and did not enter any of them.[44] He agrees that, before declaring a school building obsolete, an interior inspection must be made, and this he did not do. He apparently operates under the theory that all buildings over 40 years of age should be abandoned, without regard to the renovations and additions thereto. While it is true that there are existing school buildings which were constructed prior to 1929, it certainly does not follow that these buildings are in any sense inadequate or otherwise unfit for use. It is also true that the Board has selected certain schools for replacement in future years. The list is not nearly as long as Dr. Foster's. It seems fundamental that the Board, with its highly qualified administrative staff, is far better qualified to determine when a school building should be declared obsolete and should be replaced.

It is also interesting to note that Dr. Foster agrees that the Board used the best research materials available in establishing the principles of the optimal plan. But Dr. Foster violently disagrees with every aspect of this data which may tend to support the controverted principles. He recognizes that the Coleman Report is the result of testing hundreds of thousands of students, yet he says that there is no basis for saying that the social class is most important; no basis for finding middle class flight to any appreciable extent; no basis for stating that good educational results cannot be obtained where the percentage Negro exceeds 50%; and no basis for concluding that the disadvantaged Negro performs better with the middle class or advantaged Negro. Dr. Foster

is, of course, entitled to his opinion, but when one reads the entire testimony of Dr. Foster and Dr. Brazziel, and then examines the testimony of Dr. Pettigrew, the differences become apparent from the standpoint of knowledge and qualifications of the witnesses.

It has previously been said that the elementary school system is "weak" from the standpoint of desegregation. It is not as weak from the viewpoint of ultimate success and, as Pettigrew states, "integration." Many of the all-black or predominantly black elementary schools serve the hard-core central city area. The elementary schools at Campostella, St. Helena, Lincoln, Tucker, and Diggs Park are located in the Berkley-Campostella area which is separated from the main part of Norfolk by the Eastern Branch of the Elizabeth River and connected with Norfolk by a bridge maintained and operated by the Elizabeth River Tunnel Commission, a political subdivision of the Commonwealth of Virginia. Practically no white families live in the Berkley-Campostella area and it is adjacent to the City of Chesapeake. Even if we disregard the hard-core central city, it is virtually impossible to desegregate these five (5) elementary schools without massive compulsory cross-bussing. As Dr. Pettigrew said, if a completely unitary system means no all-black and no all-white schools, it is not forthcoming in 1970 and, we might add, in the reasonably foreseeable future on the elementary level for the Berkley-Campostella area unless there is inter-city cooperation in public schools which would permit these children to go to the City of Chesapeake.

While the public viewpoint cannot, in the final analysis, control the determina-

44. Dr. Foster only entered one school building which was Booker T. Washington High School. His visit was in August when workmen were completing the necessary renovations following the fire in April and all equipment, books, and periodicals were not in place. However, he stated that he spent 15–20 minutes in the school library and, when pressed as to library deficiencies, mentioned the lack of black history research material. Later a count was made as to the volumes of black history in this library and the total was 536. While the Court is not advised as to the aggregate number of publications pertaining to black history, it would certainly appear that 536 publications would be sufficient for any library. Testimony such as submitted by Dr. Foster tends to question the motive of this witness.

tion of constitutional issues, all experts agree—some reluctantly—that the parents and public in general cannot be wholly disregarded. When we view the Stolee plan set forth in Appendix B, we are confident that, when the public is aware of the full impact of the Civil Rights Division-NAACP proposal, there will be a controversy second to none. The City Council and School Board will be besieged with requests to stop the "mumbo jumbo" heretofore described. The experts generally agree that the future stability of the school system and the ability to "desegregate" or "integrate" with success is dependent, in a large measure, upon the trauma or concern of parents of students. As Dr. Pettigrew appropriately remarks, the paramount question in the minds of parents, both white and black, will be: "Why should my child go that far unless he is going to get something really better." This is not a feeling of white versus black as is evidenced by the efforts of many citizens who want the new senior high school in the same area as Booker T. Washington. The blacks will revolt against the Stolee plan even more than the whites and the latter, if at all possible, will probably relocate or otherwise resort to private schools.

The School Board is supplied with capital and operating funds by the City Council. The Board has no power of taxation. The City Council is elected by the public and appoints the members of the School Board. The budget for the construction and operation of the public school system is prepared by the School Board and, after review and modification by the City Manager, is submitted to the City Council for approval, rejection or modification. Thus far, the coopera-tion between the School Board and City Council has been excellent. We wonder what the result will be if the Board is required to ask the City Council for $4,000,000 capital investment for buses and $800,000 annual operating expense for the same item. Under Virginia law the City Council, once having approved the budget, has nothing to do with the manner of expenditure of funds by the Board, but the Council has the right to assume that the Board will make its disbursements in accordance with the budget. This Court expresses genuine concern as to the public pressure which will be exerted upon the City Council if the Civil Rights-NAACP program is finalized.

## MANDATORY MASSIVE CROSS-BUSSING

We start with the premise that children attending public schools in the City of Norfolk have been using public transportation facilities for many years. Students now purchase bus tickets at half-fare.[45] The details, subject to the revised computations by public transportation experts, are set forth in the *interim* plan opinion, 301 F.Supp. 18, 22–26. While the plan presented by Dr. Stolee at the interim plan hearings is substantially different from the later suggestions emanating from the same witness, the extent of cross-bussing is somewhat greater than previously advanced.

Since the witnesses testified at the *interim* plan hearings, there has been a seven cents hourly increase in wages granted to operators by the Virginia Transit Company, the corporation presently providing public transportation services to Norfolk and Chesapeake

---

45. The Superintendent of Schools testified that, as with respect to school books, lunches and, in some cases, clothes, for indigent children which are supplied gratis, the School Board recognizes its obligation to furnish worthy indigent children the financial means to get to and from a school not within walking distance under the plan proposed by the Board.

The details are not divulged and the suggestion by the Superintendent is not construed as providing free transportation for all. Of course, under the Board's plan, public transportation could still be used and the expense, while considerable, would not be beyond the reach of the School Board.

under franchise arrangements.[46] This increase is reflected in the cost of operation for the current school year, but has not been placed upon the exhibits as it is impossible to project such future costs although, based upon present costs, the estimates have been given by Armstrong, the Virginia Transit Company expert on costs.

While counsel for the NAACP has made a valiant effort to prove that any projected operation can be served by the public transportation system, primarily through the method of "staggering" the opening and closing times of various schools, it is abundantly clear that public transportation is out of the question from the standpoint of massive cross-bussing.[47] It must be remembered that, at the present time, the school buses average 1.9 trips per bus, and the record reflects that, even now, all schools do not maintain the same opening and closing times.

Nor is there any merit to the load factor analysis. The Transit Company uses a load factor of 60 to compute the number of buses required, but this figure takes into consideration the children who will ride regular commercial buses, thus resulting in an actual load nearer 45 than 60.

There is a differential between the school buses required in the morning and afternoon. This is due, in part at least, to the fact that parents find it convenient to drop their children at school while en route to work in the morning. In the afternoon, of course, this is not the situation.

For the 1969–70 school year, there are 63 buses required in the morning, and 82 in the afternoon. From a time standpoint, the school buses average 7.44 miles per hour. The total daily number of trips, morning and afternoon combined, is 273, or 2,130 school miles per day. The total number of school hours required per day is 286. There are 8,165 students transported on a daily average.

The cost of transporting pupils is $53.00 per annum, and the revenue received per student on the basis of 25 cents per round trip is $45.00. The

46. Footnote (8) under the *interim* plan opinion, 302 F.Supp. 18, 23, was not exactly correct. The contract with the City of Norfolk provides that the Transit Company is allowed a return of 3½% on gross earnings. Over and above that figure, the Transit Company gets the next $10,000. From this point on, there is a division with the City of Norfolk. For the past eight or nine years, nothing has been paid to the City of Norfolk. The school fare, 25 cents per round trip, is in obvious danger of being raised to 30 cents.

47. An effort was also made by the NAACP to establish that the Virginia State Department of Education would absorb all or a greater portion of the cost involved in massive cross-bussing. While Virginia does financially assist both county and city-operated school bus systems, it contributes nothing by way of capital outlay, equipment, replacement of buses, etc. Essentially all buses owned, or operated under private contract, by cities throughout Virginia, have been the result of large annexation proceedings which brought rural areas into the city, such as Virginia Beach, Chesapeake, Newport News and Hampton. The crux of the qualification for reimbursement by the state is that 16 miles is the *minimum* mileage that buses may be scheduled for operation. Thus, the Diggs Park-East Ocean View-Pretty Lake arrangement hereinafter discussed would be sufficient to make the buses used for this purpose eligible for state reimbursement. A bus making a morning and afternoon trip would have to travel 8 miles each way; a bus making two trips in the morning and two in the afternoon would be required to average 4 miles per trip before becoming eligible for reimbursement. Virginia Transit buses would not qualify unless they met state requirements. Virginia has not yet been met with the purely urban problem of massive cross-bussing to achieve racial balancing. To what extent and degree Norfolk would qualify for reimbursement as to operating expense if the State Department of Education regulations remain as now written is problematical. However, a rough guess is that out of $800,000 annual operating expense, approximately $250,000 would be reimbursed under existing regulations. We cannot predict whether the regulation will remain the same.

amount charged, including profit, is $56.00 per annum per child.

Under the *interim* plan proposed by the School Board, there will be 77 buses required in the morning and 97 in the afternoon. The number of daily trips will be 332, or 2,597 school miles per day. The daily number of school hours required is estimated at 349, and there will be approximately 10,000 students transported. The cost increases to $55.00 per pupil per annum.

The *optimal* plan presented by the Board contemplates the use of 87 buses in the morning and 110 in the afternoon. The number of daily trips will be 374, or 2,924 school miles per day. The daily number of school hours required is 393, and there will be approximately 11,300 pupils moved by bus. The cost increases to $56.00 per child per annum, with a total cost of $635,940 per year.

The Transit Company indicates that, by September 1970, it will be able to provide the additional buses for the morning run which is, of course, during the peak hours of bus transportation for the general public. It is also felt that, by September 1972, when the *optimal* plan goes into effect, 87 buses can probably be provided for the morning service. For reasons stated in the opinion on the *interim* plan, 302 F.Supp. 18, it is *impossible* for the Transit Company to provide more than 95 to 100 buses for school purposes at any morning rush hour.

We turn to the requirements, even though impossible to fill, of the Stolee plan which contemplates the extensive feeder system arrangement involving massive cross-bussing. The total number of students to be transported would be 25,750, including 13,050 elementary school children. It would require approximately 225 buses, covering 6,681 school miles per day, or more than double the school mileage contemplated by the Board's *optimal* plan. The daily school trips would increase to 856, and the school hours would jump to 898 based upon 1.03 hours per trip.

Using public transportation, if it were available, the total annual cost to the Transit Company would be $2,747,160, computed at $107.00 per pupil, but the Transit Company would expect to charge the City of Norfolk at $112.00 per student. Thus, the total annual cost, irrespective of who pays for same, will be approximately *four times* as much as that contemplated by the Board's *optimal* plan.

There is also testimony with reference to Dr. Stolee's plans A and B. Plan A is a suggested contiguous grouping of certain schools. Plan B is a suggested noncontiguous grouping of schools. Neither of these plans is now urged by the NAACP and Civil Rights Division for the obvious reason that they will not accomplish racial balancing throughout the entire city. Under either Plan A, or a combination of A and B, the least number of buses required for morning is 115; a number beyond the maximum which can be provided even as late as September 1972.

In the *final analysis*, we come to the point that, under any plan or system suggested by the NAACP-Civil Rights Division, resort must be had to the purchase of the typical yellow school bus or an outdated transit-type bus. This type of bus, acquired second hand, can be purchased for approximately $8,200 and, with some additional expense, can be made serviceable. Acquiring 225 buses may require only an initial expenditure of about $2,000,000 but, when we consider the necessity for storage, equipment, and many other items, the estimated capital investment of $4,000,000 is not out of line. The witnesses do not detail the estimated annual operating cost of $800,000, but it may be assumed that this figure is not entirely erroneous when contrasted with the operating costs of the Transit Company. The operating expense would be subject to any partial reimbursement mentioned in footnote (47).

An example of how flagrant the cross-bussing will reach is disclosed by Stolee's plan to move the children now attending

Diggs Park in the Berkley-Campostella area to either East Ocean View or Pretty Lake for grades one and two. The East Ocean View and Pretty Lake children normally attending grades three, four, five and six at these latter schools will be assigned to Diggs Park. The scaled distance appears to be only approximately 10½ miles, but the Transit Company expert computes this mileage at 13 plus. Whether this latter mileage includes the "loop" necessary to pick up the children residing in the areas is not too clear, but certainly the scaled mileage does not cover "loop" mileage. Counting "loop" time and discharge time, it will take about one hour and eight minutes to pick up the children at Diggs Park and deposit them at either East Ocean View or Pretty Lake. The same one hour and eight minutes will be needed to load, travel, and discharge the East Ocean View and Pretty Lake children at Diggs Park. As the experts seem to agree, the principal vice in bussing, disregarding for the moment the questions of cost and parental objection, is the time required in getting to and from school. Remembering, as we must, that we are here dealing with children six and seven years of age, it is almost beyond comprehension that any court would approve such a device merely to mix racial bodies.

There are many other examples which could be cited under the Stolee plan, each of which would adequately demonstrate the end result of massive cross-bussing, but the effort required in detailing such examples would not alter the principle set forth above.

This Court has suggested that, at least for the first three elementary grades, the neighborhood school concept should be retained. While it is the writer's personal view that the neighborhood school should continue throughout the elementary level of education, it is recognized that there are cumulative adverse effects upon black children re-quired to attend all or predominantly black schools and, for this reason, efforts should be made in the future, as buildings become obsolete, to provide more adequate desegregation on the lower level. We believe that the cumulative adverse effects begin to enter the overall picture when the child reaches the approximate age of nine, although the statistics admittedly do not appear to indicate the exact point in life that such effects become operative.

Interlocked with massive cross-bussing is the issue of *de jure-de facto* segregation next considered.

## DE FACTO VERSUS DE JURE SEGREGATION

The long finger of the law has been directed primarily to the southern states, all of which had segregation laws as applied to public schools at the time of the 1954 decision in *Brown*. Despite the Civil Rights Act of 1964, 42 U.S.C., section 2000c(b) which defines "desegregation," [48] mandatory bussing has been ordered by some courts where *de jure* segregation existed. Congress further provided, 42 U.S.C., section 2000c-6, as follows:

"(T)hat nothing herein shall empower any official or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another * * * in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

These provisions of the law are answered by the NAACP and Civil Rights Division in a twofold manner. In the first place they argue that the Constitution, as now interpreted, requires racial balancing wherever complete desegregation cannot be accomplished in any

---

48. 42 U.S.C., section 2000c(b) provides: " 'Desegregation' means the assignment of students to public schools and within such schools without regard to their race, color, religion, or national origin, but 'desegregation' shall not mean the assignment of students to public schools in order to overcome racial imbalance."

other manner. Secondly, they say, the provisions of the Civil Rights Act of 1964 do not imply that transportation may not be required in states where *de jure* segregation played a part in formulating the housing patterns which brought about segregated schools as they existed on May 17, 1954, when *Brown I* was decided.

The issue was touched upon in the prior remand of this case, Brewer v. School Board of City of Norfolk, Virginia, 397 F.2d 37 (4 Cir., 1968), in which the trial court was directed to objectively determine whether the new senior high school would take its place in a nondiscriminatory system or continue *de facto* the city's former *de jure* dual system of white and Negro schools. Since the senior high school level of education has now been resolved, the question remains as to what must be done with the other levels of education. While the Educational Park complex may afford some solution to the problem, if adopted as appropriate in urban cities with a large hard-core central black area, it is presently too remote to consider.

When the *de facto-de jure* issue was heard along with the *interim* plan hearings, the Civil Rights Division attempted to show that deed restrictions, repealed ordinances, and other factors pointed to *de jure* segregation in many areas throughout the city. Nevertheless, unless a spot of the disease poisoned the entire city, there remained other areas in Norfolk which could not be considered *de jure* constituted.

The Civil Rights Division now advances the argument that *de jure* segregation exists throughout Virginia by operation of law solely because Virginia, among many other states, had statutes on its books which required segregation of public schools prior to *Brown I*. According to counsel for the Civil Rights Division, the complete disestablishment of a previously racially segregated public school system requires racial balancing although, as heretofore noted, the Civil Rights Division concedes the possibility of "one or two" all-black schools and "one or two" all-white schools as constitutionally permissible. The NAACP contends that the Constitution now requires total and complete disestablishment of a previously segregated school system "at the earliest practicable" date, and without permitting *any* school to be attended solely by white children .or solely by black pupils.

In sum, the proponents of racial balancing insist that *de jure* segregation continues to exist throughout Virginia, regardless of good faith efforts on the part of any school board to eradicate it, until a totally "unitary system" is attained. That Norfolk is now completely free of discriminatory practices in housing and schools is best evidenced by the rapidly changing housing patterns which, in turn, are leading to resegregated schools.

As mentioned in footnote (5), we entertain grave doubts that there can be an avoidance of any constitutional mandate merely because *de facto,* and not *de jure,* segregation existed in 1954. The Supreme Court has not spoken on the subject. We believe that an analysis of the entire matter will demonstrate rather effectively that there were many discriminatory acts by state officials and/or discriminatory state laws prior to 1954 which prompted segregated housing patterns and, in turn, brought about a neighborhood school which was segregated.

If the Constitution requires complete disestablishment in the sense that racial balancing is required in each individual school and classroom wherever the state at any time required segregation of public schools, then there is no need to go further; there is no necessity for complex plans; and much of the elapsed time since the 1954 decision in *Brown I* has been wasted.

In Taylor v. Board of Education, 294 F.2d 36, 39 (2 Cir., 1961), cert. denied 368 U.S. 940, 82 S.Ct. 382, 7 L.Ed.2d 339 (1961), the court stated that one line between *de facto* and *de jure* school seg-

regation was whether "race was [being] made the basis for school districting, with the purpose and effect of producing a substantially segregated school." Under this definition, apparently only the actions of the school board would be subject to scrutiny, but we doubt that the Second Circuit would ignore discriminatory actions by other public officials or discriminatory legislation.

In Moses v. Washington Parish School Board, 276 F.Supp. 834, 840, 847 (E.D. La., 1967), the court said " 'de jure segregation' means simply 'segregation' in the traditional sense, that is, forced, purposeful separation of the races." As to de facto segregation, the court defined same as "the mere chance or fortuitous concentration of those of a particular race in a particular class or school— fortuitous 'separation' of the races, not accomplished in any way by the action of state officials." The court later added: "Most situations of so-called 'de facto segregation' are, in reality, the result of intentional discrimination by state officials."

Assuming arguendo that de jure segregation is the result of either discriminatory public laws or actions by public officials, we have great difficulty in determining how any segregation can actually be de facto. Research discloses that practically every state, outside the so-called "Deep South," at some point in history had either (1) mandatory segregation of public schools, (2) permissive segregation, (3) anti-Negro voting laws, (4) miscegenation statutes, or (5) local practices, as revealed by judicial deci-

sions or articles, regardless of state laws. Whether such state action required or merely permitted school segregation should be irrelevant if the result was segregation of the races. Even where such statutes were repealed prior to 1954, the pattern of segregation may have been so well established that its continued existence could only be de jure.[49]

It may be argued that anti-black voting laws and miscegenation statutes play no part in de jure segregation. When we examine the many states which prohibited blacks, Orientals, Indians, etc., from voting, we wonder what would have been the end result if these powerful voting blocks could have legally mustered their strength on such matters as "open housing" and the like. Indeed, school segregation laws may not have been enacted if all persons could have cast their ballots. Once the housing pattern in a particular area is established as black, history demonstrates that it remains black unless it is subjected to a massive housing and redevelopment project. Undoubtedly, miscegenation statutes do not compare with anti-black voting laws as to the cause of segregation in schools or housing patterns but, according to Loving v. Virginia, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967), such statutes "must stand on their own justification, as measures designed to maintain White Supremacy." Moreover, we cannot overlook the "moral force" of the law in states which, although not saddled with school segregation statutes, took action on voting, miscegenation, housing, deed restrictions and the like, all pointing to the fact that the Negro was con-

---

49. Thus, the courts in Bell v. School City of Gary, Indiana, 213 F.Supp. 819 (N.D. Ind., 1963), affirmed 324 F.2d 209 (7 Cir., 1963), cert. denied 377 U.S. 924, 84 S.Ct. 1223, 12 L.Ed.2d 216 (1963), would have been required to consider fully whether the pattern of school segregation established under Indiana's mandatory school segregation law which was repealed in 1949, still existed at the time of that decision. If the de jure label is crucial, the court should have ascertained whether the residential segregation then existing was at least in part the result of the prior mandatory school segregation law. It would not be sufficient merely to consider actions since 1949.

Similarly, in Deal v. Cincinnati Board of Education, 369 F.2d 55 (6 Cir., 1966), if the de jure label is significant, the the court should have considered the effect, if any, of prior segregation laws in creating patterns of residential or school segregation. It does not necessarily follow that patterns established by laws in the past would not persist even today.

sidered inferior for one reason or another.

We cannot believe that the Constitution may be interpreted one way for a group of states, and still another way for the remaining states. While we do not believe that the mandate of the Constitution goes beyond the *affirmative* mandate mentioned in the earlier portion of this opinion, we think it obvious that, whatever may be the correct interpretation of the Constitution, the same construction must apply to all 50 states. Certainly it must be applied to any state where any discriminatory statute, judicial decision, or official act existed for many years prior to 1954.

Attached hereto as Appendix C will be found, on a state-by-state basis,[50] the extensiveness of state statutes and/or judicial decisions. The list is not intended to be inclusive: for example, where there was mandatory segregation in public schools, other segregation or discriminatory laws were not included. It does not refer to housing ordinances and deed restrictions legalized in many states. Furthermore, it is impossible, through research of the cases and statutes alone, to uncover all examples of discriminatory action by public officials regardless of what the state laws required.

We conclude that the *de facto-de jure* issue is not a determinative factor in arriving at what is required under *Brown I* and the subsequent cases. We believe that the *affirmative* mandate mentioned herein applies to all states, but that it must be reasonably and feasibly construed consistent with the circumstances confronting the local school board in each area.

### FACULTY

For the past several years Norfolk has taken advantage of the opportunities afforded through the Department of Health, Education and Welfare in preparing teachers called upon to serve disadvantaged children, especially those predominantly of the opposite race. All experts agree that this advance preparation is of vital importance in securing effective teachers in desegregated conditions. Dr. Brazziel indicated that some colleges now prepare the prospective teacher for these conditions, but the record does not reflect how many new teachers have this advance training. The experts conclude that each teacher called upon to teach substantially desegregated schools and/or disadvantaged children must be so prepared.

The goal of the School Board, as proposed in the *optimal* plan, is that the faculties of the schools will approximately reflect the ratio of available white and Negro teachers in the system.[51] This goal will be achieved in the 1971–72 school year. For the 1970–71 school year it is anticipated that about one-half of the goal will be reached.

The Civil Rights Division and NAACP have no quarrel with the goal under the *optimal* plan. They insist, however, that this goal be achieved not later than January 31, 1970. Presumably teachers already trained for teaching in desegregated schools have already been filtered into these positions. What other teachers, if any, have received the necessary advance training is not revealed by the evidence.

For the 1969–70 school year, *every* school in the system has teachers assigned across racial lines. For example, Booker T. Washington, with 2,268 black and 7 white children, has 27 white and 90 Negro teachers. Blair and Maury, now predominantly black, have a predominantly white faculty, but also have

50. We have omitted from Appendix C any reference to statutes or judicial decisions from the states of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, and Louisiana. All of these states had constitutional provisions and/or statutes requiring segregation in public schools.

51. This is, of course, a form of racial balancing, but it is not crucial with faculty members as presumably the majority drive to and from work in private automobiles. It involves no massive cross-bussing as with respect to pupils.

12 and 13 Negro teachers, respectively. Stuart, predominantly black, has 24 white and 10 Negro teachers. Campostella and Chesterfield Heights, both predominantly black, have majority white faculties. Marshall and Monroe, predominantly black, have majority black faculties at ratios of 18 to 10 and 24 to 19, respectively. A full review of the existing faculty assignments for the current year certainly does not indicate that the Board is attempting, in the slightest degree, to keep the faculty of any school racially identifiable.

While there are many instances of principals and administrators of the white race leading a school which is all or predominantly black, only Northside and Oceanair, schools predominantly white, are governed in whole or in part by black administrators. This will, in due time, be corrected as Dr. Pettigrew has stressed the importance of having a reasonable percentage of black administrators in predominantly white schools. A total of 8 administrators out of 102 have been assigned across racial lines this year. A Negro has recently been designated as Assistant Superintendent of Schools and is now serving in that capacity.

■ We think that the objective timetable required by the previous decision in *Brewer* has been fully met and is specific in its terms. We decline to order the advancement of the goals under the *optimal* plan to January 31, 1970, and we feel that the Board's program is entirely reasonable and consistent with better educational policies.

We are not unmindful of the recently decided Nesbit v. Statesville City Board of Education, supra, in which five school cases were consolidated and the Court of Appeals directed as follows:

"All plans must include provisions for the integration of the faculty so that the ratio of Negro and white faculty members of each school shall be approximately the same as the ratio throughout the system. In deter-

mining the ratio, exceptions may be made for specialized faculty positions."

If the foregoing language is meant to go beyond the plan and put the ratio into effect at once, then no plan was needed. We construe the action of the Fourth Circuit as requiring a fixed plan for an orderly transition into the approximate ratio mentioned.

■ It is rather obvious that, without mentioning same, the Fourth Circuit has effectively overruled Wheeler v. Durham City Board of Education, 363 F.2d 738, 741. Apparently, in order to comply with *Nesbit*, the wishes of the individual teacher are entitled to very minor consideration in the matter of assignments. However, Norfolk has recently abandoned the school designation in contracts submitted for signature. While the evidence suggests that the Board may yield to a teacher who insists upon an assignment to a specified school, this is not in any sense violative of constitutional principles. The Board is entitled to exercise some discretion to meet the seller's market which still prevails in the teachers' field.

There is no merit to the contention that discrimination has been shown in the assignment of substitute teachers. It does not justify any discussion.

\* \* \*

In this complex field of desegregation and integration of the public school systems throughout our country, what is really needed is a return to sanity in the enforcement of effective plans which will aid children of both races from an educational and cultural standpoint. Unless the social class climate is given primary consideration, the beneficial results of desegregation will never be achieved and the educational system will collapse.

Counsel will exchange, on or before January 5, 1970, proposed copies of an order to be entered in accordance with this memorandum opinion. Counsel will meet at Norfolk on January 9, 1970, at 2:00 p. m., for the purpose of settling the order unless agreement is reached prior thereto.

## APPENDIX A

The following contains a list of desegregated schools in the City of Norfolk, dependent upon whether a "desegregated" school is classified at 10%, 20% or 25%, computed to the nearest percentage point approaching the above-stated percentages. These figures are for the 1969–70 school year.

| 10% | 20% | 25% |
|---|---|---|

### Senior High Schools

| 10% | 20% | 25% |
|---|---|---|
| Granby | Norview | Maury |
| Lake Taylor | | |

### Junior High Schools

| 10% | 20% | 25% |
|---|---|---|
| Rosemont | Norview | Blair |
| Willard | | |

### Elementary Schools

| 10% | 20% | 25% |
|---|---|---|
| Chesterfield Heights | Larchmont | Campostella |
| Crossroads | | Cerebral Palsy |
| Easton | | Norview Elementary |
| Larrymore | | Norview Annex |
| Meadowbrook | | Sewells Point Elementary |
| Ocean View | | Sewells Point Annex |
| Suburban Park | | Stuart |

Total school attendance for 1969–70: 56,628
    Total white: 32,621
    Total black: 24,007
    Total blacks attending schools
    desegregated at least to the
    extent of 10%: 5,918

(Note: These figures include Maury, Blair, Campostella, Stuart, and Chesterfield Heights where the majority are black and where whites are in attendance to the extent of 10% or more.)

Percentage of black children in attendance at predominantly white schools and schools which are racially desegregated at least 10%: 25% (plus)

As of September 1972, when the new senior high school is open, 2,268 blacks will automatically be added to the 5,918 blacks now in attendance at predominantly white schools and at schools which are desegregated at least 10%, making a total of 8,186, or 33% (plus). This figure does *not* include the increases contemplated by other aspects of the plan nor, as Dr. Pettigrew stated, the increases anticipated over and above the plan itself.

## APPENDIX B

An approximation of mileage between elementary schools paired for certain grades under the Stolee plan, computed according to route assumed to be the shortest.

| SCHOOLS PAIRED | DISTANCE |
|---|---|
| Oceanair<br>Young Park | 7.2 miles |
| Oakwood<br>Calcott<br>Crossroads<br>Titus (closed) | Average 3.1 miles<br><br>Note: Oakwood, under Stolee plan, will house only grade 6. Children attending Calcott, Crossroads and Titus will be paired for grades 1–2–3–4–5 and will attend Calcott and Crossroads. |
| Suburban Park<br>Carey | 4 miles |
| Lee<br>Granby | 3.7 miles |
| Campostella | Not paired with any other school, but well in the process of resegregation. Current year: blacks 136; whites 45. |
| Liberty Park<br>Ingleside<br>Poplar Halls | Average 3.2 miles<br><br>Note: Children in Liberty Park will attend Ingleside and Poplar Halls for grades 1–2–3–4. Children living in Ingleside and Poplar Halls will go to Liberty Park for grades 5–6. |
| Chesterfield<br>Heights | Not paired with any other school, but now substantially resegregated. Current year: blacks 671; whites 51. |
| Diggs Park<br>East Ocean View<br>Pretty Lake | Average 10.5 miles<br><br>Note: Testimony of expert on bus transportation gives this figure as 13 miles. Children in Diggs Park area will travel to East Ocean View and Pretty Lake for grades 1–2. Children at East Ocean View and Pretty Lake will travel to Diggs Park for grades 3–4–5–6. |

| SCHOOLS PAIRED | DISTANCE |
|---|---|
| Tucker Fairlawn Easton | Average 6.6 miles (via Virginia Beach Expressway)<br><br>Note: Children in Tucker area will travel to Fairlawn or Easton for grades 1–2–3–4. Children at Fairlawn or Easton will travel to Tucker for grades 5–6. |
| Bowling Park Lansdale Pineridge | Average 2.9 miles<br><br>Note: Children in areas of Bowling Park and Lansdale will attend Pineridge for grades 1–2–3. The Pineridge children will attend either Bowling Park or Lansdale for grades 4–5–6. |
| Stuart | Not paired with any other school but, as noted in footnote (42), it is obvious that this school will soon be completely resegregated. |
| Marshall Meadowbrook Sewells Point | Average 5 miles<br><br>Note: Children heretofore attending Marshall will travel to either Meadowbrook or Sewells Point for grades 1–2–3–4. Children heretofore attending either Meadowbrook or Sewells Point will go to Marshall for grades 5–6. |
| Madison Larchmont Taylor | Average 2.75<br><br>Note: Children ordinarily attending Madison will be divided between Larchmont and Taylor for grades 1–2–3–4. Children at Larchmont and Taylor will be sent to Madison for grades 5–6. |
| St. Helena Lakewood | 4.9 miles<br><br>Note: St. Helena children will attend Lakewood for grades 1–2–3–4. Lakewood children will attend St. Helena for grades 5–6. |
| Ballentine | Will house only grade 6 and will draw from Lafayette and Lindenwood. |

| SCHOOLS PAIRED | DISTANCE |
|---|---|
| | Average 1.7 miles |
| Lafayette<br>Lindenwood | Note: Lafayette children will attend Lindenwood for grades 1–2–3. Lindenwood children will attend Lafayette for grades 4–5. Children of both Lafayette and Lindenwood will attend Ballentine for grade 6—an approximate distance of 1.7 miles. |
| Norview | Not paired with any other school. Now thoroughly desegregated, but with a majority white. |
| Monroe<br>Sherwood Forest<br>Coleman Place | Average 3.5 miles<br><br>Note: Children in Monroe area will be divided between Sherwood Forest and Coleman Place for grades 1–2–3–4. Children at Sherwood Forest and Coleman Place will attend Monroe for grades 5–6. |
| Little Creek<br>   Elementary<br>Little Creek<br>   Primary<br>Lincoln | 9 miles<br><br>Note: Children at Little Creek (Elementary and Primary) will attend Lincoln for grades 1–2. Children at Lincoln will attend Little Creek for grades 3–4–5–6. |
| Gatewood<br>Larrymore | 8.3 miles<br>Note: Children at Gatewood will attend Larrymore for grades 1–2–3–4. Children at Larrymore will attend Gatewood for grades 5–6. |
| West<br>Tarrallton | 6.8 miles<br>Note: Children in West area will attend Tarrallton for grades 1–2–3–4. Children in Tarrallton area will go to West for grades 5–6. |
| Bay View<br>Goode<br>Tidewater Park | Average 7.5 miles<br>Note: Children in Bay View area will be divided between Goode and Tidewater Park for grades 1–2–3. Children in areas of Goode and Tidewater Park will go to Bay View for grades 4–5–6. |

| SCHOOLS PAIRED | DISTANCE |
|---|---|
| Camp Allen | Not paired with any other school. In process of construction. Will be thoroughy desegregated. |
| Roberts Park Willoughby Ocean View | 8.2 miles<br><br>Note: Children at Roberts Park will be divided between Willoughby and Ocean View for grades 1-2-3-4. Children in Willoughby-Ocean View area will be assigned to Roberts Park for grades 5-6. |

No estimate of time required for travel, an admittedly important factor, has been made. The time required for the morning run will undoubtedly be longer than the afternoon run, due to traffic conditions involving people en route to work at approximately the same hour.

————◆————

## APPENDIX C

A list of states with discriminatory laws or judicial decisions, excluding the states mentioned in footnote (49) in which mandatory school segregation laws existed on May 17, 1954.

### ALASKA

In Davis v. Sitka School Board, 3 Alas. 481 (1908), it was held that semi-civilized Indians did not have to be admitted to public schools. It went on to find that the step-children of "an industrious, law-abiding, intelligent native" Indian, who operated a store "according to civilized methods," and had adopted the white man's style of dress; spoke, read and wrote the English language; and was a member of the Presbyterian Church; were not civilized enough to attend white schools because they still lived with other members of their tribe.

Sing v. Sitka School Board, 7 Alas. 616 (1927), upheld separate but equal schools for Indians.

### ARIZONA

Ariz.CodeAnn. (1939), section 54-416, provided for mandatory segregation in *elementary* schools. Under section 54-918, there was permissive segregation in *high* schools, where there were more than 25 blacks in the high school district and if approved by a majority vote of the electorate. By an amendment in 1951, section 54-416 was made permissive and section 54-918 was repealed.

### ARKANSAS

Ark.Stat.Ann. (1947), section 80-509 (c), required the establishment of separate schools for white and colored.

### CALIFORNIA

While laws enacted in 1869-70 and 1880-81 provided (1) mandatory separate schools for Negro and Indian children, and (2) permissive separate schools for children of Mongolian or Chinese descent, a statute enacted in 1943 but repealed in 1947 reenacted the permissive separate school provision and provided that, if separate schools were established for Indian children or children of Chinese, Japanese or Mongolian parentage, they could not be admitted to any other school. Cal.Educational Code, section 8003 (Deering's 1944). *See* also: Cal. Laws 1869-70, p. 838; Cal.Political Code, section 1662 (Deering's 1885).

### COLORADO

Miscegenation statute, Colo.Stats.Ann. c. 107, sections 2, 3 (1935). Jackson v.

City and County of Denver, 109 Colo. 196, 124 P.2d 240 (1909) holds that an otherwise valid common law marriage between a black and a white was declared to be "immoral" and justified a conviction under a vagrancy statute defining same to include leading an "immoral course of life."

## CONNECTICUT

Conn.Const., Art. VI, section 2 (1818), limited the electorate to white male citizens owning property. In 1845 the property qualification was deleted. In 1876 the Constitution was amended by removing the requirement that electors be white.

## DELAWARE

Del.Const., Art. X, section 2 (1915) provided for separate schools. By the Del.Rev.Code, Ch. 71, section 9 (1935), two kinds of separate schools were authorized; "those for white children and those for colored children."

## DISTRICT OF COLUMBIA

D.C.Code, title 7, sections 249, 252 (1939 Supp.), authorizes separate schools for white and colored in the District.

## IDAHO

Idaho Const., Art. 6, section 3 (1890), prohibits Chinese or Mongolians, not born in the United States, from voting, serving as jurors, or holding civil offices.

Miscegenation statute: 1867, p. 71, section 3; R.S. section 2425, reenacted Rev.Code section 2616; amended 1921, Ch. 115, section 1, p. 291.

## ILLINOIS

Ill.Const., Art. II, section 27 (1818), limited the electorate to white males.

Although no statute respecting school segregation has been located, history is replete with evidence of discriminatory practices in operating separate schools for many years. *See* Ming, The Elimination of Segregation in the Public Schools of the North and West, 21 J.Negro Ed.

265, 268 (1952); B. H. Valien, Racial Desegregation of the Public Schools in Southern Illinois, 23 J.Negro Ed. 303 (1954); Shagoloff, A Study of Community Acceptance of Desegregation in Two Selected Areas, 23 J.Negro Ed. 330 (1954). *See* also: United States v. School District 151 of Cook County, Ill., 301 F.Supp. 201, 217 (D.C., 1969).

Thus, Illinois, without a specific statute, practiced segregation in public schools prior to 1954, almost as much as in the "Deep South."

## INDIANA

Ind.Stat.Ann., section 28–5104 (Burns' 1933), provided for the establishment of separate schools for Negroes if the school authorities believed it to be necessary or proper but, if no separate schools were established, Negroes could attend white schools. In 1949, the separate school law was repealed, Laws, 1949, Ch. 186, section 11.

## IOWA

Iowa Laws, Ch. 99, section 6 (1846), provided that schools were to be open to all white persons.

Iowa Laws, Ch. 52, section 30 (1858), called for the education of colored children in separate schools except where there was unanimous consent of all attending the school to allow Negroes to attend the white school. This act was declared unconstitutional in District Township of City of Dubuque v. City of Dubuque, 7 Iowa 262 (1858), on the ground that the Constitution gave the power to legislate with regard to education to the Board of Education and not to the General Assembly. Thereafter, the Board of Education provided education for all "youth" and in Clark v. Board of Directors, 24 Iowa 266 (1868), this was construed as requiring admission of Negroes into white schools.

The Iowa Const., Art. II, section 1 (1857), provided that only white males could be electors. Iowa Code, Ch. 130, section 2388 ff. (1859), stated that no colored person could be a witness.

## KANSAS

Kan.Gen.Stat., section 72–1724 (1949), gave authority to establish and maintain separate primary schools for whites and Negroes throughout the state, and separate high schools in Kansas City. *See:* Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 38 A.L.R. 2d 1180 (1954).

## KENTUCKY

Ky.Const., section 187; Ky.Rev.Stat., section 158.020 (1946), required separate schools for white and colored children.

## MARYLAND

Md.Code Ann., Art. 77, sections 124, 207 (1951), required the county boards of education to establish one or more separate schools for Negroes, provided that the colored population of any such district warranted, in the board's judgment, an establishment of separate colored educational facilities.

## MASSACHUSETTS

In Roberts v. City of Boston, 59 Mass. 198 (1849), the court stated that separate schools had been maintained for colored children "for half a century." The court upheld the school committee in denying admission to a white school by a Negro child. However, six years later Massachusetts by statute abolished the practice of excluding on account of race, color or religion.

## MICHIGAN

A dissenting opinion in People ex rel. Workman v. Board of Education of Detroit, 18 Mich. 400 (1869), states that in 1841 separate schools for colored were established in Detroit. The court was construing an amendment to the general school law which provided that all residents had an equal right to attend schools and the statute was held to apply to Detroit.

In Day v. Owen, 5 Mich. 520 (1858), the court upheld a regulation excluding a Negro from the cabin of a steamer solely for the reason of his race.

People v. Dean, 14 Mich. 406 (1866), held that only whites, or those at least three-fourths white, could vote.

Miscegenation statute, C.L. 1857, § 3209, C.L. 1871, § 4724, prohibited marriages between whites and Negroes until the statute was amended in 1883.

## MINNESOTA

Minn.Rev.Stat., Ch. 5, section 1 (1851), and Minn.Const., Art. VII, section 1 (1857), excluded Negroes from voting until amendment of November 3, 1868.

## MISSOURI

Mo.Const., Art. XI, sections 1, 3 (1875), and Mo.Rev.Stat., section 163.130 (1949), required separate schools and "it shall herein be unlawful for any colored child to attend any white school, or for any white child to attend a colored school." These provisions were repealed in 1957, three years after *Brown I.*

## MONTANA

Mont.Ter.Laws, 1872, p. 627, provided for separate schools of children of African descent when requested by at least ten such children. This statute was repealed in 1895.

Miscegenation statute, Mont.Rev.Code, section 5700 (1935).

## NEBRASKA

Neb.Rev.Stat., Ch. 48, section 8 (1866), imposed upon the local school directors the duty of taking an annual census of unmarried *white* youth between the ages of five and twenty-one for the purpose of school assignments. Neb.Rev.Stat., Ch. 48, section 48 (1866), establishing the school system states that it is "for the purpose of affording the advantage of a free education to all *white* youth of this territory," and further provides that all colored persons shall be "exempted from taxation for school purposes." These laws were repealed in 1869.

Miscegenation statute. Neb.Rev.Stat., section 42–103 (1943).

## NEW JERSEY

N.J.Comp.Stat., pp. 4791–92, Schools sections 201–204, pp. 4814–16, Schools sections 262–267 (1911), established an industrial school for blacks.

In M. T. Wright, Racial Integration in the Public Schools in New Jersey, 23 J. Negro Ed. 282 (1954), there is reference to an 1850 statute permitting a township in Morris County to establish separate schools for colored children.

In Williams and Ryan, Schools in Transition, p. 122 (1954), it is said: "A survey of 62 school districts, initiated in the spring of 1948, revealed that two-thirds had segregated schools sanctioned by local custom and practice."

N.J.Const., Art. II, section 1 (1844), limited suffrage to white males.

## NEW MEXICO

N.M.Stat., section 55–1201 (1941 Annot.) allowed school boards to place children of African descent in separate schools if the facilities were equal.

## NEW YORK

N.Y.Consol.Laws, c. 15, section 921 (Cahill 1930), provided that trustees of any union school district organized under a special act may establish separate schools for colored children provided that the facilities are equal. On March 25, 1938, this law was repealed.

## NORTH DAKOTA

Miscegenation statute, N.D.Rev.Code, section 14–0304 (1943).

## OHIO

Under Ohio Stat., Ch. 101, section 31 (1854), separate schools for colored children were authorized and required when there were more than thirty school-aged colored children in a township. This statute was repealed in 1887. It was held in State ex rel. Garnes v. McCann, 21 Ohio St. 198 (1871) that the existing statute deprived the Negroes of the right to admission at white schools.

Separation of races on an educational level under the separate but equal theory was upheld in State ex rel. Weaver v. Board of Trustees, 126 Ohio St. 290, 185 N.E. 196 (1933).

## OKLAHOMA

Mandatory separate but equal schools required for black and white children. Okla.Const., Art. I, section 5; Art. XIII, section 3; Okla.Stat., Title 70, section 5–1 (1949 Supp.).

## OREGON

Miscegenation statute. Ore.Comp. Laws Ann., section 63–102 (1940). Statute repealed 1951.

## PENNSYLVANIA

In Hobbs v. Fogg, 6 Watts 553 (Pa., 1837), the Court held that a free male Negro was not a freeman entitled to vote under the Pennsylvania Constitution providing that all freemen could vote. In 1838, the Pennsylvania Constitution, Art. III, section 1, restricted voters to white freemen. In 1874 this restriction was removed.

While unable to locate the statute, H. M. Bond, The Education of the Negro in the American Social Order, p. 378 (1934), states that in 1854 Pennsylvania enacted an optional separate school law when there were more than twenty Negroes in a district. This law was reportedly repealed in 1881.

## RHODE ISLAND

Ammons v. School Dist. No. 5, Town of Charlestown, 7 R.I. 596 (1864), held that Indian tribes were not entitled to send their children to local public schools since the state had provided schools for Indians through a special state appropriation.

## SOUTH DAKOTA

Indians were required to attend federal schools established for them whenever such schools were available. S.D. Laws, Ch. 138, sections 290–293 (1931); S.D.Code, section 15.3501 (1939).

Miscegenation statute. S.D.Code, section 14.0106 (1939).

## TENNESSEE

Mandatory separate schools for colored children. Tenn.Const., Art. XI, section 12; Tenn.Code, section 2377, 2393–2399 (1932).

## TEXAS

Mandatory separate schools for colored children. Tex.Const., Art. VII, section 7; Tex.Ann.Rev.Civ.Stat., Articles 2719, 2900 (1925).

## UTAH

Utah Laws and Ordinances, 1851, An Ordinance to Incorporate Great Salt Lake City, section 6, provided "all free white male inhabitants are entitled to vote * * *"

Miscegenation statute. Utah Code Ann., section 40–1–2 (1943).

## WEST VIRGINIA

Mandatory separate schools for colored children. W.Va.Code, Ch. 18, Art. 5, section 14 (1931).

## WISCONSIN

Indians required to attend · separate schools where such schools were available. Wisc.Stat., section 40.71 (1949). Repealed in 1951.

Under Wisc.Stat., section 75.14(4), restrictions surviving the issuance of tax deeds (after tax sales) which were valid and enforceable included those regarding the "character, race or nationality of owners." Statute repealed in 1951.

## WYOMING

Wyo.Comp.Stat.Ann., section 67–624 (1945, but originally enacted in 1876), provided that the school boards could establish separate but equal schools for Negroes.

## SUMMARY

Only as to the states of Maine, New Hampshire, Vermont, Washington, Nevada, and Hawaii does it appear from this nonexhaustive research that no discriminatory laws appeared on the books at one time or another. No consideration has been given to Puerto Rico, Virgin Islands, Canal Zone or Guam.